No. 13.—URBANUS DART, *et al.* plaintiffs in error, *vs.* JAMES HOUSTON, *et al.* defendants in error.

[1.] The State is not inhibited by any provision in the Federal Constitution, from passing an act controlling the management of an incorporated Academy, which is endowed entirely by the State. It may change the mode of electing Trustees and supersede those in office.

[2.] If Trustees of an incorporated Academy are elected under the authority of an act which does not declare the number to be elected, and the Legislature subsequently recognizes the trustees thus elected as the legal board, it is a ratification of the election.

[3.] If a corporate body consist of ten, and a suit is brought by five of the members of the corporation, setting out their names, it is not the suit of the corporation, the charter not authorizing a less number than a majority to sue.

[4.] A *quo warranto*, does not afford an adequate remedy to *cestui que trusts*, who charge trustees of an incorporated Academy with breaches of trust; nor is it adequate for their successors who make the same charges, though the former claim the office on the ground that they have not been legally superseded.

In Equity from Glynn Superior Court. Decision on demurrer, by Judge Cochran, at April Term, 1857.

The following is the bill and exhibits filed by complainants in this cause, and to which defendants demurred.

Georgia, Glynn County.

*To the Honorable the Judge of the Superior Court of the Brunswick Circuit of the State of Georgia, having jurisdiction in Equity.*

Humbly complaining, showeth unto your Honor, your Orators, James Houston, J. M. Tison, S. M. Burnett, S. M. Timmons and J. W, Moore, Trustees of Glynn County Academy, in the county of Glynn, and said State, chosen by the Grand Jury of said county, according to the provisions of the act of the Legislature of said State, dated February 18, A. D 1854, who institute this bill of complaint in their said capacity as Trustees, as well as in behalf of the citizens of Glynn county;—that on the 18th day of February, A. D. 1854, the Legislature of said State passed an act, the title of which is in the words following, to wit: "An act to alter and change the mode of appointing Trustees of Glynn County Academy, in the county of Glynn, and to compel their Treasurer to give bond and security for the faithful performance of his duty, and for other purposes therein named"—and that the

first, seventh and eighth sections of which are in the words following, to wit:

"SEC. 1. *Be it enacted by the Senate and House of Representatives of the State of Georgia, in General Assembly met, and it is hereby enacted by the authority of the same,* That from and after the passage of this act, the Trustees of the Glynn County Academy, in the county of Glynn, shall be appointed by the grand jury of said county, at the first term of the Superior Court after the passage of this act, or at any term hereafter, by ballot or otherwise, as they may deem proper."

"SEC. 7. *And be it further enacted, &c.,* That the present Trustees be, and they are hereby required, to turn over to the Trustees appointed under this act, all the books, buildings, papers, lands and money belonging to said academy fund."

"SEC. 8. *And be it further enacted,* That all laws and parts of laws militating against this act be, and the same are hereby repealed."

And your orators further inform your Honor, that at the date of the passage of this act aforesaid, and for a long period afterwards, as your orators are informed and believe, Urbanus Dart, E. C. P. Dart, Alexander Scranton, Thomas Bourke, Henry Dubignon, Wm. A. Couper, H. F. Grant, D. H. B. Troup, Wm. Gignilliat and F. M. Scarlett, all of said county and State, were the acting members of the said old Board of Trustees of said academy, and that several of them were acting members of the grand jury the year then next ensuing, and that they used their influence over that body during said time, as your orators are informed and believe, to denounce and to resist the said law of the State and to prevent the grand jury of said county at either of the terms of said court for the year A. D. 1854, from electing said Trustees of said academy, and that principally in consequence thereof, no Trustees of said academy were chosen by said grand jury during said year of A. D. 1854, and the

operation of law of the State enacted for the benefit of the people of Glynn county was thereby defeated for that year. And your orators further inform your Honor, that at the April term A. D. 1855, of said Superior Court, for said county, the grand jury of said county, in accordance with the provisions of said act, did duly elect F. M. Scarlett, H. F. Grant, W. A. Couper, Thomas Bourke, H. Dubignon, S. M. Timmons S. M. Burnett, J. W. Moore, J. M. Tison and James Houston, Trustees of Glynn County Academy—that the five first named persons were five of the same persons above named, as having been the acting members of the old Board aforesaid —that said H. F. Grant and W. A. Couper thereupon instantly declined to accept said office, and being members of said grand jury, and combining with said U. Dart and three other members of said body, they assumed to pronounce, and in their capacity as grand jurors did pronounce said law of the State to be unconstitutional and void, and entered their protest upon the records of said grand jury to that effect— that said Thomas Bourke and H. Dubignon declined to accept said office, or to discharge any of its duties—and that the said F. M. Scarlett having so far accepted said office as to attend the first meeting of the said newly elected Board of Trustees of said academy immediately thereafter resigned his said office. And your orators ask leave to annex a copy of the record of their said election by said grand jury, and of said protest, which is marked A.

And your orators further inform your Honor, that immediately after their said election, they duly met and duly organized their said Board by the choice of S. M. Burnett as Chairman, J. W. Moore as Secretary, and James Houston as Treasurer ; and that thereupon they immediately took upon themselves the duties and responsibilities belonging to said Board, and proceeded to assume the discharge of the same; and that in pursuance thereof, they engaged a teacher for said academy; and on the 21st day of May A. D. 1855, as said Trustees, they took possession and control of the said acade-

my building, situate in the village of Brunswick, in said county, and placed said teacher in the same, and opened a school therein under his and their immediate direction, for all the children of said county of Glynn, and have maintained said teacher and his successor and said school therein, from that date to the time of the filing of this bill of complaint, and have paid the expenses of the same.

And your orators further inform your Honor, that the said act of February 18th, 1854, does not prescribe the number of which said newly elected Board shall consist; but the grand jury having appointed ten persons, acting under the impression, as your orators believe, that the old Board aforesaid consisted of ten members legally appointed thereto; your orators being desirous that their number should be increased to ten, if it would be legal so to do, and that the vacancies of those who had resigned, should be filled by men who would recognize their obligation as public officers, charged with the possession of a portion of the funds of the State, and to obey the laws of the State in reference thereto; they reported the number of their Board to the said grand jury of said court, at the last April term thereof, with other pertinent facts connected therewith, according to the provisions of said act—but said U. Dart and Alexander Scranton, being members of said grand jury, combined, together with others, to produce violence in said grand jury room—and to intimidate other members of said grand jury, and to resist said act of the Legislature, and the instructions of the presiding Judge, which they had sent for and obtained, in reference thereto, and finally to abandon said grand jury room, and to break up the session of said body before any definite action could be had upon that subject, as your orators are informed and believe.

And your orators further inform your Honor, that in the year A. D. 1796, the State of Georgia commenced to create a fund from the sales of the State lands, and from other resources of the State, to be used under the direction of such agents as the State might, from time to time, appoint, or

cause to be appointed for that purpose, in supporting an academy or Seminary of learning, for the common use and benefit of all the people of the said county of Glynn; and that for the purpose of carrying into effect this design, and to bring home to all of the children of the county of Glynn, the means of education at the expense of the State, by an act of the Legislature of the State dated February 21st, A. D. 1796, George Purvis, Richard Pritchard, Moses Burnett, John Piles and John Burnett were appointed commissioners to lay out the town of Brunswick into lots, and to sell certain lots therein belonging to the State—and among other things the third section of the act required in the language following: that "the monies arising from such sale shall be applied to the support of an academy or seminary of learning, in the county of Glynn." And by the act of February 13th, 1797, the commissioners aforesaid of Brunswick were authorized to sell five hundred acres of land belonging to the said State, and called the commons of Brunswick—"which monies arising from the sale of said land shall be applied, under the direction of said commissioners of Brunswick, as follows, to wit: one moiety thereof to the use of the court house and jail, and the other to the use of the academy."

And your orators are informed and believe, that from these and other sources, the State of Georgia furnished the funds necessary to establish, and did establish and maintain an academy for the use and benefit of the people of said county, called the Glynn County Academy, and which was superintended by officers of the State, called commissioners of the town of Brunswick, and appointed by the State for that purpose.

And your orators further inform your Honor, that on the 13th of December A. D. 1813, by an act of the Legislature, William Page, Henry Dubignon, Gee Dupree, Leighton Wilson, and William Houston were appointed commissioners of the town and commons of Brunswick and of Glynn County Academy; "and were fully authorized to sue and be sued,

and to do all things that may be necessary to recover such monies as may be due for rent or otherwise to the former commissioners of the aforesaid town and commons"—and thereafter by the terms of said act, only one quarter part of the rents of said commons were to be appropriated to the court house and jail of said county—and the number of commissioners as Trustees for said academy still continued to be five, and thereafter three-fourths of the State fund was to be used in maintaining said academy instead of one-half as formerly.

And your orators further inform your Honor, that on the 18th day of December A. D. 1814, the Legislature of Georgia, by an act of that date, added John Burnett and James May to said Board of Commissioners of said academy, making the number seven instead of five, and continued to said board the same coporate powers "to sue and be sued," &c., and authorized them to choose one of their own Board Treasurer, and required him to give satisfactory security, and continued the use of the same proportion of the State fund, to each of the aforesaid county purposes, to wit: three-fourths to the support of the academy, and one-fourth to the court house and jail.

And your orators further inform your Honor, that by an act of the Legislature, dated December 20th, 1817, entitled "An act to alter the manner of appointing the commissioners of Glynn and McIntosh counties," it was enacted as follows, to wit: "That in future the commissioners of the academy of the county of Glynn shall be elected by the persons entitled to vote for members of the General Assembly, and be superintended by one magistrate and two freeholders of the county; and the persons having the highest number of votes shall be duly elected, and they shall hold their appointments for the term of four years, and until their successors are elected." Other sections prescribed the time for said elections, and the term of the office to be four years, and repealed all laws inconsistent therewith, and these commission-

ers were clothed with the same corporate powers over said State funds, that were exercised by their predecessors in said office.  And the change consisted only in the mode of choosing said Trustees, and in the persons, and not in the powers, duties, or rights of the two sets of the incumbents.

And your orators further inform your Honor, that on the 3d day of December A. D. 1821, and before the said four years had expired, Samuel Boyd, Henry Dubignon, James Moore, Isaac Abrahams and John Gignilliat were appointed Trustees of said academy, and they and their successors were declared to be a body corporate, by the name of the Glynn County Academy; and they were clothed with the same powers, as all the former boards and with some additional powers, to make bye-laws, &c., and their numbers were reduced from seven to five, and they were appointed by the Legislature, instead of being chosen by the people, and had authority to fill vacancies in their Board, and like all their predecessors appointed by the Legislature, they held their office for no specified period of time.

And your orators further inform your Honor, that on the 22d day of December A. D. 1823, the Legislature passed an act, the first section of which is in the words following, to wit: "That Robert Hazlehurst and James Hamilton Couper be, and they are hereby appointed, commissioners of the Glynn County Academy, in addition to those already in office, and they are hereby authorized to appropriate all or any part of the money which may be on hand belonging to said academy in the establishing of two free schools, one in the 26th district, at or about Wm. Houston's, and one in the 27th district, at any place the commissioners may think proper, and they are authorized to employ one teacher for each school." By the 3rd section of said act, it was enacted, "That the operations of said Glynn County Academy shall cease,**** until the funds of said Institution shall so increase as to enable the commissioners to carry into effect the above named free schools, and by a subsequent section, the Treasurer of said

Board of Trustees was required to account to said commissioners for the money on hand.

And your orators further inform your Honor, that on the 21st day of December A. D. 1835, the Legislature passed an act, the Preamble to which is in the words following, to wit: "Whereas there are about nine hundred acres of commons attached to the town of Brunswick, which is more than necessity or convenience requires ; and whereas the academic and poor school fund of the county of Glynn is not sufficient for the purposes of education in said county ;" therefore the commissioners were authorized and required to lay off into lots, three hundred acres of the commons of Brunswick, and sell the same. "That one-half of the proceeds of the sale of said lots should be applied to the support of *free schools* under the *direction* of the Trustees of Glynn County Academy, and the other half to augment the funds of said academy." And that in pursuance of said authority, said lots were sold immediately thereafter, and said Trustees realized therefrom, as your orators are informed and believe, about fourteen thousand six hundred and fifty dollars, in the summer of 1836.

And your orators further inform your Honor, that from December A. D. 1823, to December 1838, said Board consisted of seven persons as aforesaid, and that on the 31st day of said December A. D. 1838, there was incorporated into a Legislative act, the following words, to wit: "That Urbanus Dart, Francis M. Scarlett, William A. Howard, Frank Gage and J. Bancroft be, and they are hereby added to the Board of Trustees of the academy of the county of Glynn," thereby making the number of acting members twelve instead of the former number.

And your orators submit to your Honor, that as the title of said Act makes no reference to this part of said enactment, whether the said enactment is not wholly void under the provision of the State Constitution, designed to restrain persons from practising frauds upon the Legislature, the State, and the people ? And whether said U. Dart, and his said

associates, have ever been legitimate members of said Board?
And your orators further inform your Honor, that all of said
Dart's said associates so added to said Board, have resigned,
and others have been added in their places by said Board,
without even the form of law for the same, as your orators
are informed and believe.

And your orators further inform your Honor, that during
the half century or more which has elapsed since the State
commenced the creation of said fund, to be used and expen-
ded for the common benefit of all the children in Glynn
county; the State alone has created the entire fund, that no
part of the same has been furnished from any other source;
that the State only has appointed or caused to be appointed,
in the mode prescribed by law, all agents to manage said
funds; that all said agents have held their said offices only
during the pleasure of the State authorities; that all the
powers of said agents over said funds; have been derived on-
ly from the State, to be used not for the benefit of themselves,
but for the benefit of the people of Glynn county; that the
State alone has prescribed the mode in which the official ex-
istence of these agents, as such, may have been perpetuated
during the pleasure of the Legislature; that the State has re-
moved the said agents at pleasure and appointed others in
their stead, and changed from time to time their numbers,
their powers and their duties, and designated the different
public purposes to which said monies should be applied and
specified the different and exact proportions from year to
year, in which said appropriations were to be made, that the
only party who have been the recipients of the States bounty
during said period, has been the people of Glynn county;
the State alone has given, the people alone of said county
have received: and that all persons, or Boards, denominated
Trustees, or Commissioners of the academy, of the court-
house and jail, or of the poor children of said county, have
been only instruments, or conduits in the hands of the State,
through which the bounty of the State has flowed to the

people of the county of Glynn ; that said Trustees and commissioners have never had any interest in said funds, or in
the manner, or purpose of their appropriation, beyond that
which has been common to every citizen of Glynn county ;
that the only two parties who are interested in said funds, are,
on the one hand the giver, the State of Georgia, and on the
other hand, the receiver, the people of Glynn county ; that
said Trustees have not any equitable lien on said funds for
any purpose, nor upon their said offices, as said Trustees ; and
that they, and their predecessors, came into office, as they
were removed from them, by the will of the Legislature of
the State: all of which acts, your orators submit, carry their
own construction with them, and afford a contemporaneous
interpretation of the power and purposes of the different legislative bodies of the State, and of the understanding and
position of the different boards of said Trustees, too clear and
too well defied, to be mistaken by these respondents.

And your orators further inform your Honor, that the State
of Georgia committed to the care of said different boards of
Trustees and commissioners, about fifteen hundred acres of
land, denominated "commons of Brunswick," and all the
"unappropriated lots" of land of the town of Brunswick, all
said lands being situate in the town of Brunswick, and gave
said boards ample powers to protect the same, and made it
their especial duty so to do, and to collect the rents and profits of said "Brunswick commons and town lots," for the use
of said academy fund ; and in the year 1796, the Legislature passed an act to prohibit persons from running up said
lands, and to take from the Executive of the State, the power
to issue any grants for the same, and if issued to make such
grants null and void, which act is in the words following :

"And whereas, several persons have at sundry times made
attempts to run up the commons of said towns of (Brunswick and Frederica,) but have been as often defeated in the
caveat courts of said county, by the exertions of some of the
proprietors of the said towns of Brunswick and Frederica,

"Be it enacted, that any person or persons who may attempt to run up any part of said commons or towns of Brunswick or Frederica, under any pretence whatsoever, shall be liable to a fine of five hundred dollars, to be recovered in the Superior Court of said county, by the commissioners, or any other person or proprietor of any lot or lots in the same towns, which said money shall be applied, one half to the use of the academy and the other to the use of the person, or persons sueing for the same, and all surveys heretofore made, or grants surreptitiously obtained, are hereby declared null and void, and any person or persons taking possession, by virtue of any survey or grant as aforesaid, shall be liable to the aforesaid fine, to be recovered in manner aforesaid." And your orators further inform your Honor, that in the year A. D. 1826, said U. Dart, for the purpose of acquiring a large number of said town lots of Brunswick to his own use, and to deprive the said academy fund of the same, and in direct violation of said law of the State, run up all said academy lots in said town of Brunswick, and as your orators are informed and believe, by a fraudulent misrepresentation, or concealment of the facts from the Executive of the State, obtained grants of the same to himself and one William B. Davis; and that they and those claiming under them, have pretended to own the same, and have collected the rents and profits of said lots to their own use; and the said Dart now claims to own the following lots in said town, so run up as aforesaid by him, and to collect the rents and profits of the same to his own use and benefit, and that he has collected the rents and profits of the same to his own use, during the whole time he has been an acting Trustee in said Board, said lots being about one hundred and forty, as designated in said Dart's said notice, a copy of which your orators annex and mark B.

And your orators further inform your Honor, that since the year A. D. 1838, said U. Dart has been an acting and leading member, as your orators are informed and believe, of

the said Board of Trustees of said Academy fund, and that it was made his duty, as said Trustee, to have protected said property, and to have collected the rents and profits thereof, for the use of said academy fund, and of the people of Glynn county.

And your orators further inform your Honor, that prior to the year A. D. 1837, the commissioners of said academy fund, had sold seven hundred and eighty-five acres of the "commons of Brunswick;" and that about that time, Thomas Butler King, at that time a member of said Board of Trustees of said academy fund, run up and surveyed about seven hundred and five acres of said commons of Brunswick, being the entire remaining part of said commons except about ten acres, and obtained from the Executive of the State, by a fraudulent misrepresentation, or concealment of the facts, all the said land, as your orators are informed and believe, for his own use and benefit, including in said grant, the academy building then standing thereon, and which had been erected by said Trustees, at an expense to said academy fund, of six thousand dollars; and your orators are informed and believe, that at that time, and for many years before that time, said Trustees had been in possession and occupancy of said lands and buildings, and had been receiving the rents and profits, thereof; and that said academy building had been used and occupied by the children of the people of Glynn county, as such; and that said Trustees in disregard of their duty allowed said King to take the possession of the said lands, and to deprive them of the rents and profits thereof, and to take possession of said academy building and to place his own tenants therein; and that said King immediately thereafter sold said academy building and all said land, to other parties, who now claim the same under his said title, and that said academy building is now occupied by a private citizen as his own property; and that from that time to the time of filing this bill of complaint, the said academy fund has been deprived of the use of the same; and that between the years of A. D.

1838 and 1841, said Board of Trustees erected another academy building out of the same academy fund, at an expense of six to eight thousand dollars, to replace the one they surrendered to said King as aforesaid, in the village of said Brunswick.

And your orators respectfully submit to your Honor, that it was the duty of said board of Trustees and their successors in office to have prevented said lands from being so run up and surveyed by said Dart and said King, and from being so occupied by them ; and to have filed their caveats before the proper tribunals of the State, and to have prevented both said Dart and said King, from obtaining their said grants; and to have retained possession of said lands and said academy building against said Dart and King, or any person claiming under either of them, as it was their duty to resist an open and avowed trespasser upon said lands, or a bold depredator upon the monies of said academy fund ; that the terms of said statute having deprived the Executive of any power or authority to issue such grants, said grants were absolutely void, and consequently were nullities; and that the Trustees of said boards for the time being and their successors, have been guilty of a gross neglect of duty toward said property and said trust fund, and guilty of wasting and losing the same, and the rents and profits thereof, from that time to the present; and that they are bound, as your orators insist, out of their own individual property to make good to said fund the full amount of principal and interest so lost and wasted by them, and each of them.

And your orators further inform your Honor, that by virtue of the laws of the State, it was the duty of the said several boards of Trustees since the year A. D. 1823, to have appropriated one moiety of said academy fund to the support of two free schools, one of which at or near William Houston's, a populous neighborhood about twelve miles from the village of Brunswick, and the other in some convenient part of district number twenty-seven, in said country, also a pop-

ulous part of said county; but that said old Boards of Trustees, have systematically disregarded the laws of the State, and the wishes of the people of Glynn county, in this respect, and that they have never established or maintained, for any considerable time any such school near said Houston's, in district number 26, nor any such school in district number 27, except for short periods; and for the last fifteen years, as your orators are informed and believe, no such free school has been kept or maintained in either of said districts, as required by law, and that in consequence thereof, the great body of the children of Glynn county, living out of said village of Brunswick, have been deprived of the benefits of said school fund.

And your orators further inform your Honor, that by the Act of February 14, 1856, the board of Trustees elected under the Act of February 18, 1854, are required to erect suitable buildings for the children of said county, at or near St. Paul's Church, and on the St. Illa neck in said county, and to elect a teacher or teachers, and cause them to be paid out of the interest of said fund, after the interest of the fund created by the Massie donation has become exhausted;" and that one-half of the funds raised and paid over to the Trustees of Glynn County Academy, under the aforesaid Act of December 21, 1835, was thereby set apart for the education of the poor children of the county, the interest of which is to be applied by said Trustees, elected under said Act of 1854, as aforesaid."

And your orators further inform your Honor, that one moiety of the sum received from the sale of said 300 acres of said town commons to said academy fund, with the interest and the dividends upon the stocks in which the same have been invested, will amount as your orators are informed and believe, to thirty thousand dollars or more, exclusive of any amount that may have been paid out according to law, for the support of said two free schools in said districts number 26 and 27. And your orators submit that the said

Board of Trustees and the members thereof are liable, and should be compelled to pay the full amount of said free school fund to your orators, to be by your orators expended according to the provisions aforesaid of said act of February 14, 1856.

And your orators are further informed and believe, that of the funds received by said board of Trustees. as aforesaid, they now hold and possess about twenty thousand dollars, in cash and stocks, and that the same is deposited in the Planters Bank, Central Rail Road and Banking Company, and the Bank of the State of Georgia, all situate in Savannah in said State, and that in addition, there is due from said U. Dart the balance of an execution of about six hundred dollars, for monies loaned to him from said trust fund in 1847, that said U. Dart and E. C. P. Dart, with some other parties, owe said fund about two thousand dollars, for the balance of a loan made from said fund to the Brunswick Lumber Company in 1840, of which said Messrs. Darts were members, and personally liable for its debts, as your orators are informed and believe; and that there is due from said Thomas Butler King, in principal and interest, eight to ten hundred dollars, for $373 delivered to him at Milledgeville, in the year A. D. 1839, belonging to said fund, and not paid over by him to said fund.

And your orators are informed and believe, that there has been taken out of said fund, by Alexander Scranton, principally in the year 1853, between fourteen and fifteen hundred dollars; and as your orators believe for about one moiety of that sum, the academy fund has received no adequate consideration; and that amount is due to said fund accordingly from him.

And your orators further inform your Honor, that said Act of February, 18th, 1854, took effect from the day of its passage, and thereby removed the members of the old Board accordingly, from their said offices of said Trustees, on that

day; and that since their said removal, as aforesaid, they have expended, of said academy fund, about six thousand and two hundred dollars; that four hundred and fifty dollars of this amount has been by them paid, to retain six counsellors of the law, eminent for their learning and ability, to enable said pretended Board the better to resist the laws of the State, and the application of the said funds of the State to the purposes and objects of, and in the manner, designated by the different Legislatures of the State; and, as your orators are informed and believe, other large sums have been paid out of said fund, for the salaries of school teachers, kept for the benefit of the children of said respondents and a few other persons; and your orators respectfully submit to your Honor, that said respondents from their individual property, are bound to restore the said amount to said funds, with the interest thereon, or its equivalent therefor.

And your orators further inform your Honor, that all the records of said several boards of trustees and commissioners, are lodged in the keeping of said E. C. P. Dart, as the acting Secretary of said pretended board; and that your orators have demanded the same and an inspection thereof; but that the same have been refused; and that in consequence thereof, your orators are not now able to inform your Honor more particularly, who constituted said boards at different periods of the same; and cannot, therefore, at this time, make them parties to this bill.

And your orators further inform your Honor, that Henry Dubignon is the acting Treasurer of said pretended board of trustees, and has been Treasurer of all the aforesaid boards, since the year A. D. 1816; that he has exhibited freely the books to your orators, of said old boards of Trustees wherein the Treasurer's accounts have been kept. And that your orators have demanded of him said academy fund, and all the funds, property and stocks of the said fund, or belonging thereto, or making a part of the same, either under the con-

trol of himself, as said Treasurer, or of the said old board. And said Dubignon has informed your orators, that he is desirous of surrendering the same to your orators, and believes it to be his duty, and the duty of the old board to obey the laws of the State, till they are adjudged to be void by the Courts of the State; but that he is restrained from so surrendering said academy funds, by the order and direction of the said old board of Trustees; and that therefore he desires the order and authority of this Court for so doing, and for his protection and security, and to place the said funds under the order and protection of said Court to be by your Honor disposed of according to the final adjudication of said Court.

And your orators are further informed, and believe, that since the said 18th day of February, A. D. 1854, at some time, said William A. Couper, Thomas Bourke, and F. M. Scarlett have resigned their said offices, as said Trustees in said old board, and that their places have been filled by the election by said pretended board, of J. H. Couper, Alexander McDougald and Robert Hazlehurst, Jr., in said county and State; and that said three last named persons have acted as members thereof, and participated in the expenditure and partial waste of the aforesaid six thousand two hundred dollars, since their said election. And your orators are further informed and believe, that said J. H. Couper was one member of said board of Trustees at the time said King took said lands and said academy building from the control of said board of Trustees aforesaid, and remained au acting member of said board many years thereafter, but for the reasons before stated, they are not able to give the dates, nor the names of his said associates.

And your orators had well hoped that the said members of the said old board of Trustees aforesaid, would have complied with your orators' reasonable requests, and with their own duty in the premises, and yielded that obedience and respect which are due to the laws of the State, and to the

administration of justice in the Courts of the State, and would have abstained from the demoralizing example of resisting the enactments of the same authority that gave them their official existence, and of usurping the power delegated only to the Judiciary of the State, of pronouncing legislative acts to be null and void.

But so it is, may it please your Honor, the said respondents conspiring and confederating with divers persons unknown to your orators, but whom, when discovered, your orators pray may be made parties to this bill, with apt words to charge them, absolutely refuse to comply with your orators' reasonable requests, and to comply with the said laws of the State, and refuse to surrender up the books, property, papers, records, lands, monies and stocks in their possession, and under their control, belonging to said academy fund, and to account to your orators for the monies and property which have been by them expended and wasted, as aforesaid, or any part of the same; or to cease to act, as said board of Trustees, or to cease to claim possession of said academy building, or to control said academy funds, and insist upon going on with their illegal acts, and the waste and expenditure of said academy funds; all of which said acts and doings are contrary to equity and good conscience, and tend to the wrong and injury of your orators and of the citizens of said county of Glynn in the premises. In consideration whereof, and for as much as your orators can only have adequate relief in the premises in a Court of Equity, where matters of this nature are properly cognizable and retrievable—To the end therefore, that the said Urbanus Dart, E. C. P. Dart, Alexander Scranton, Thomas Bourke, Henry Dubignon, Wm. A. Couper, H. F. Grant, D. H. B. Troup, Wm. Gignilliat, F. M. Scarlett, Alexander McDonald, Hazlehurst Jr., J. H. Couper and Thomas Butler King; and also the Planters Bank, the Central Rail Road and Banking Company, and the Bank of the State of Georgia, and their confederates and

associates, when discovered, may, upon their several and respective corporal oaths, to the best and utmost of their several and respective knowledge, remembrance, information and belief, full, true, direct and perfect answer make, to all and singular the matters aforesaid, and that as fully and particularly as if the same were here repeated, and they and every one of them distinctly interrogated thereto; and that an account may be taken of all the said Trust property, and of the funds which have, or but for the default and neglect of the said respondents, might have, been received by them, or by any other person or persons, by their orders or the order of either of them; and also an account of their application thereof, and that the said respondents may respectfully be decreed to pay what shall appear to be due from them upon such account, and that said respondents may be removed in fact, as they have been in law, from being and acting as said Trustees, and that in the meantime, some proper person may be appointed by your Honor to receive and collect the said Trust estate and effects, and that the said respondents may be restrained and enjoined by the order of this Court, from any further interference with the said Academy Trust fund, or the academy building; and that said Banks may be restrained and enjoyed from paying out any of said trust funds, or from disposing of or transferring any of the same, except by the order of the court; and that your orators may have such other and further relief as the nature and justice of the case may require. May it please your Honor, to grant unto your orators the writ of injunction to be directed to the said respondents, enjoining them and each of them from interfering in any manner with said trust fund of said Glynn County Academy, or with said academy building, and requiring them and each of them to surrender the records and books of said Board of Trustees into the hands of the said Court, and also enjoining said Banks from paying out any part of said funds, or using the same, or transferring any of the said

stock belonging to said academy fund, except by the order of this Court, and also the writ of subpœna to be directed to each of said respondents commanding them, upon a day named therein, and under a certain penalty, to appear before this Honorable court, to answer this bill of complaint; and to perform and abide by such order and decree as to your Honor shall seem meet. And your orators will ever pray.

A. G. JEWETT,

WRIGHT & SAVAGE,

*Solicitors of Complainants.*

"You, James Houston, a Trustee of Glynn County Academy, in behalf of the Trustees of said Glynn County Academy, complainants in said bill, do solemnly swear that the facts stated in the bill are just and true to the best of your knowledge and belief.

JAMES HOUSTON.

Sworn to before me this 20th day of May, 1856.

FRANCIS M. SCARLETT, *J. I. C. G. C.*

AT CHAMBERS, May 20th, 1856.

*Read and Sanctioned.*

Let the writ of injunction issue. as prayed for, in the sum of thirty thousand dollars.

A. E. COCHRAN,

*Judge Superior Court, B. C.*

### EXHIBIT A.

Election of Trustees for Glynn County Academy by the grand jury for April term, 1855, and on counting out the vote the following is the result:

No. 1. F. M. Scarlett, 15. No. 2. H. F. Grant, 15. No. 3. W. A. Couper, 15. No. 4. Thomas Bourke, 15. No. 5. H. Dubignon, 15. No. 6. S. M. Timmons, 15. No. 7. S.

M. Burnett, 14.   No. 8.   J. W. Moore, 13.   No. 9.   J. M. Tison, 13.   No. 10. James Houston, 13.   Wm. Gignilliat, 1. E. C. P. Dart, 2.   A. Dart, 2.   F. D. Scarlett, 1.   Dr. Troup, 1.

A true statement of the Poll.

HUGH FRAZER GRANT, <i>Foreman.</i>

The undersigned protest against the Election of Trustees for the Glynn County Academy under the Act of the Legislature at its last session, as being unconstitutional.

HUGH FRAZER GRANT,<br>
U. DART,<br>
WM. ANDLEY COUPER,<br>
THOS. FULLER HAZZARD, M. D.<br>
ALEX. McDONALD,<br>
SILAS W. TAYLOR.

A True Copy of the Record.

*Attest*—J. W. Moore, *Clerk S. C. G. C.*

## EXHIBIT B.

*Notice.*—All persons are forbid trespassing in any manner whatever on the following lots of land in the Town of Brunswick, Ga., as laid out and designated in a plan of said Town, by George R. Baldwin, Civil Engineer, in the year 1837. Water Lots Nos. 6, 7, 8, 9, 10, 14, 19, 23, 24, and Bay lots Nos. 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 23, and Town lots Nos. 57, 58, 59, 60, 61, 63, 64, 65, 69, 70, 71, 73, 99, 118, 119, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 149, 150, 151, 153, 179, 185, 186, 187, 188, 189, 190, 191, 192, 193, 203, 271, 272, 275, 278, 284, 285, 286, 287, 292, 293, 294, 295, 296, 297, 298, 301, 302, 303, 331, 332, 333, 345, 346, 347, 367, 308, 369, 370, 371, 377, 378, 379, 380, 381, 399, 404, 405, 408, 412, 415, 416, 417, 418, 419, 420, 421, 127, 428, 431, 462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 477, 478, 479, 480, 481, 512, 513, 514, 517, 518, 519,

520, 521, 527, 528, 529, 530, 531.   The law will be rigidly enforced against all trespassers, whenever such trespassers can be indentified.

URBANUS DART, <i>Trustee.</i>

April the 30th, 1856.

To this bill defendants demurred.   The Court overruled the demurrer, and defendants excepted on the following grounds:

1st. That the Court erred in overruling the special demurrer of the defendants to the bill of complaint.

2d. That the Court erred in not dismissing the bill of complainants, upon the grounds taken by the demurrer of defendants.

3d. That the Court erred in deciding that the Act of the General Assembly of the State of Georgia, approved 18th of February, 1854, with reference to the Glynn County Academy, was not violative of private right, but was constitutional.

4th. That the Court erred in deciding that the Glynn County Academy was a public corporation.

5th. That the Court erred in deciding that the Trustees of Glynn County Academy, under the original charter, had no vested beneficial interest in the fund, but only a naked power which the State could resume at pleasure.

6th. That the Court erred in deciding that the Trustees chosen by the grand jury of the county of Glynn, were ever duly organized.

7th. That the Court erred in deciding that the complainants not being a majority of the Trustees had a right to file their bill claiming to have the whole fund turned over to them.

8th. That his Honor erred in deciding that the complainants had not a remedy at law adequate to all their rights in the premises.

LAW, BARTOW & LOVELL; WARD, OWENS & JONES; for plaintiffs in error.

A. G. JEWETT; WRIGHT & SAVAGE, for defendants in error.

*By the Court.*—McDONALD, J. delivering the opinion.

It is necessary in the outset, to consider whether the "Trustees of the Glynn County Academy," be a corporation of the class, which constitutes a contract between the State Government and the corporators, within the meaning of that clause of the Federal Constitution which inhibits a State from passing a law impairing the obligation of contracts.

The great and leading case which brings the grant of a charter or an act of incorporation of any sort, within the protection of the Constitution of the United States, as a contract, in the case of the *Dartmouth College vs. Woodward*, 4. *Wheaton*, 518. That judgment has become the law of the land, irrepealable by Congress, and irreversible, except by the tribunal which pronounced it. It is therefore, a controlling authority in this case. The college, whose charter was the subject of discussion in that case, was endowed by private donations. With the statement of this simple fact, we shall proceed, at once, to principles conceded or established in the adjudication of that case, applicable to the case before us. The Chief Justice, in delivering the opinion of the Court remarked that "if the act of incorporation be the grant of political power, if it create a civil institution to be employed in the administration of the government, *or if the funds of the College be public property*, or if the State of New Hampshire, as a government, be alone interested in the transactions, the subject is one in which the Legislature of the State may act, according to its own judgment, unrestrained by any limitation of its power imposed by the Constitution of the United States."

4. *Wheat.* 639, 630.   After reviewing the most essential parts of the charter, he says: " it is apparent that the funds of the college consisted entirely of private donations." *Ib.* 632. His conclusion was, that it was an eleemosynary, and as far as respected its funds, a private corporation. *Ib.* 633-4.   The argument of the Court admits that education is an object of national concern, and a proper subject of legislation.   The Chief Justice in speaking of Dartmouth College asks, "where then can be derived the idea that it has become a public institution, and its trustees, public officers, exercising powers conferred by the public, for public objects ?   Not from the source whence its funds were drawn ; for its foundation is merely private and eleemosynary." *Ib.* 635.   It is said again, that " the character of civil institutions does not grow out of their incorporation, but out of the manner in which they are formed and the objects for which they are created.   The right to change them is not founded on their being incorporated, but on their being the instruments of the government, created for its purposes." *Ib.* 638.   Justice Washington places the right of government and visitation in private corporations for charity, on the property in the lands which the founder assigned to support the charity. *Ib.* 666.   Judge Story goes one step further, and says: " if the charter were a pure donation, when the grant was complete and accepted by the grantees, it involved a contract, that the grantees should hold, and the grantor should not re-assume the grant, as much as if it had been founded on the most valuable consideration." *Ib.* 684.   For the reasons assigned by the various Judges who delivered opinions at length, a majority of the Court, overruled the judgment of the State Court of New Hampshire sustaining the several acts of the Legislature of that State amendatory of the charter of the college.   Judge Duval dissented, but he wrote out no opinion.   The members of the Court who concurred in the judgment of reversal, did not agree in the reasons for that judgment, and those reasons

involved very important principles; but it may be safely, averred, we think, that the controlling reason with a majority of the Court was, that the college was endowed by private donations, and that the charter having been granted in consideration of such donations, it had all the requisites of a contract, and was protected against Legislative interference on the part of the State, by the Constitution of the United States. We feel warranted in saying, that if the government had been the founder of the college, the decision would have been otherwise.//At any rate, the *case* is not an authority that the Legislature of a State has no control of an eleemosynary institution, where it is the sole contributor of the fund which supports it, and creates a corporation for the purpose, simply of carrying out its objects.// The question as presented in the Dartmouth College case was considered a most important and delicate one, and the opinions delivered by the different Judges, show that it was not without embarrassment. A charter had been granted by the King of England, and at the time of the grant, it was well known to the parties who received the charter, that it was subject to be modified, amended or annulled, at the pleasure of the sovereign power of the Kingdom. The Court, with deference be it spoken, may have experienced some difficulty in arriving at the conclusion, that the law of the land, which recognized this strong, but perhaps necessary power, of modification or repeal, did not enter into the contract and form a part of it. If it did, a mere change of the sovereign power could have no effect upon the contract, but it remained as it was, with all its express stipulations, and subject to all its implied conditions, and among them this power of control.

We will now trace the history of the Glynn County Academy, investigate its rights under the several Acts of the General Assembly, on which it, or the defendants for it, claim exemption from legislative control.

The 54th clause of the Constitution of February 1777,

declares that "schools shall be erected in each county, and supported at the general expense of the State, as the Legislature shall hereafter point out." *Watkins' Dig.* 15.

The 14th section of the Act for the more full and complete establishment of a public seat of learning in this State, declares that all public schools instituted or to be supported by funds or public monies, in this State, shall be considered as parts or members of the University, and shall be under the foregoing rules and regulations, (being those prescribed for the University.) *Cobb* 1086. Those rules and regulations show that the action of the Board of Visitors and the Board of Trustees, was to be submitted to the supervision of the General Assembly. The first appropriation for an academy in the County of Glynn was made by the Act of 1st February, 1788. Commissioners were appointed for the town of Brunswick who were authorized to survey the town, and to sell all or any of the vacant lots in said town, except such as were reserved for public use, and the monies arising from the sale, were to be applied to the building and support of an academy in said town, and to no other purpose whatever. *Watkins Dig.* 381. The Constitution of 1789, is silent on the subject of education, but it gives to the Legislature power to make all laws and ordinances which they shall deem necessary and proper for the good of the State, which shall not be repugnant to the Constitution.

In 1796, the Legislature passed an Act, pretty much the same as the Act of 1788, making provision for the support of an academy or seminary of learning, in the County of Glynn. *Wat. Dig.* 598. In 1797, the Legislature made further provision for said academy. *Ib.* 669. In 1813, the Legislature enacted that the Commissioners of the town and commons of Brunswick, should be Commissioners of the ocademy, and appointed Commissioners. *Lamar's Dig.* 977. In 1814, the Legislature again appointed Commissioners and authorized them to sue, and subjected them to suit. *Ib.* 978.

In 1817, the Legislature passed an Act providing for the election of Commissioners of Glynn County Academy, declaring their term of service, and pointing out the mode of filling vacancies. *Ib.* 19. In 1821, an Act was passed to incorporate Glynn County Academy, and five Trustees were appointed, and invested with all manner of property then belonging to the said institution, or which might thereafter be conveyed or transferred to them, to have and to hold the same for the proper use, benefit and behoof of the said academy. *Daw. Comp.* 6. In 1823, two *Commissioners,* in addition to those already in office, were appointed for said academy. *Ib.* 17. In 1829, the Inferior Court of Glynn County, was authorized and empowered to sell the academy building in said county, and to apply the proceeds of the sale to the education of poor children in said county, and for other county purposes. In 1838, five additional Trustees were added to the Board by an Act of the Legislature. *Acts of* 1838, *p.* 7. At the same session, the Brunswick Academy was incoporated, and the act to authorize the Trustees of the Glynn County Academy to establish free schools in said county was repealed. *Acts of* 1838, *p.* 11. Without looking further into the Legislation on this subject, prior to the year 1854, we will briefly remark of the Act of February of that year, that it changes the mode of electing Trustees, and requires the then existing Board of Trustees to turn over to the Trustees appointed under that act, all the books, buildings, papers, lands and money belonging to the academy fund.

By the Constitution of 1777, schools erected in the several counties were to be supported at the general expense of the State. The University was established in 1785, and the act establishing it, made all public schools instituted, or to be supported by the State, members of the University, and subject to the same rules and regulations, which placed them under the control of the General Assembly. In 1788, the

first appropriation was made for the erection and support of an academy in the county of Glynn, and its endowment proceeded from the State exclusively. The Legislature usually constituted new Commissioners for that academy, without reference to former appointments. This was its practice down to the time of the incoporation of certain persons as Trustees of Glynn County Academy, and by that very act, it displaced Commissioners chosen under the provisions of a prior statute, and which Commissioners had been previously authorized to sue and had been subjected to suit. By the act of incorporation, it does not appear that donations had been made to the academy by private individuals, and when it invested the Trustees with all the property, &c. belonging to the institution, it invested them with the property only which had been contributed by the State. The act authorized the Trustees to accept donations, &c. for the academy, but it is alleged in the bill, that its funds and property consist of those exclusively appropriated by the Legislature to its use.

It is therefore not an institution protected by the Constitution of the United States, against the Legislation of the State. 4. *Wheat.* 629-30. But after the act of incorporation, the Legislature continued, as before, to exercise the power of control over the government of the academy. It appointed, first, two additional Commissioners, who acted with the Board as Trustees, increasing their number to seven, and afterwards appointed five other Trustees, and repealed the act in which the two were appointed. It is insisted that this last act is unconstitutional. But it is immaterial to the present enquiry, whether that be so or not. The question is as to the legislative control claimed and exercised over the government of the academy. It was exercised, and its act was acquiesced in, and the new members of the Board, claiming title under legislative appointment, subsequent to the act of incorporation, which fixed the number of Trustees at five, had, of course, a controlling power over the affairs of the in-

stitution, the two appointed under the Act of 1823 continuing to act after the repeal of the law.    If the act of 1854 is unconstitutional, the acts increasing the number of Trustees are equally so, (unless passed at the instance of the Trustees, which does not appear,) and if the Academy had been founded on private donations and incorporated in consideration thereof, these last named acts would have fallen within the decision of the Dartmouth College case, and according to the judgment there rendered, would have been void.    But the funds of the Academy are public property, and the Legislature was not, therefore, restricted by any limitation of State power in the Federal Constitution, from passing the Act of 1854.

The opinion of Justice Story, goes farther.    He insists that a charter incorporating an eleemosynary institution, whether it be founded on public or private donation, is a contract within the meaning of the Constitution of the United States, on the ground that all corporate franchises are legal estates, that they are powers coupled with an interest, and that the corporators have vested rights in their charter as corporators.    *Story on Con.* §1392.    In the case of *Allen vs. McKean*, he maintained the same doctrine, and when he referred to the Dartmouth College case to support it, he referred to that part of it which contained his own reasons for concurring in the judgment pronounced by the Chief Justice, and in which reasons, Justice Livingston alone agreed with him.    In the Courts of the United States, that decision cannot be considered as authority, until it becomes an established principle that a single associate Justice of the Supreme Court, presiding alone, in his own Circuit, may over-rule a decision of the Supreme Court.    We cannot recognize it as authority here.    We think the decision of the Supreme Court goes far enough, on reasons concurred in by the majority of the Court, and it is not quite certain that a period may not arrive, when there shall be cause of regret that that Court placed a construction on the

constitutional power of the States which restricts them from repealing or modifying acts of incorporation of any sort passed by them.    The Supreme Court itself declared that it was more than possible, that the preservation of rights of the description then under consideration (corporate rights) was not particularly in the view of the framers of the Constitution, when the clause under consideration was introduced into that instrument.    A construction of the Constitution was asked which would restrict a State in the exercise of a sovereign power—a power to control a body of its own creation in the exercise of functions and the enjoyment of privileges granted to it for the promotion of local, but of public interests.    Before such a construction was given to it, it ought to have been justified, we are disposed to believe, palpably by the letter and intent of the Constitution.    There was no greater danger here, where all the constituent parts of the Legislative power are mediately or immediately representatives of the people, than in England, where only one of its component parts is chosen by the people, that the Legislature would violate the rights of private property by the repeal or modification of one of its acts, granting a charter; or that it would interfere, in any manner, therewith, except when the public interest required it, and except, also, upon ample security against injury to private property, which had been conveyed under the charter to the corporation, or accumulated by it. As evidence of this, it has become the practice in many of the States for the Legislatures, in granting charters, to reserve the power to alter or repeal them at pleasure, thus putting them, on the footing they were before the decision of the Supreme Court, and in no case has this power been exercised, within our knowledge, to the detriment of private interests. In every case in which it has been exercised, it has been done with great caution, and in no instance, except in cases where the misconduct of the corporation has made it necessary to the public safety.

Dart et al. vs. Houston et al,

But conceding Judge Story's opinion to be the law of the land, then the act of 1854, was constitutional. If the five Trustees appointed by the act of incorporation of 1821, ac quiesced in the subsequent appointment, by the Legislature, of additional Trustees, solely from an impression of the constitutional powers of the Legislature thus to interfere, and it had no such power, this acquiesence amounts to nothing, and did not affirm a void act. From the bill before us we can infer nothing on the subject, as nothing is averred. From the acts of the Legislature it does not appear that the increase of the number of Trustees was petitioned for by the existing Board, but it seems to have been the voluntary action of the Legislature, exercising, as before, its right to manage and control this Academy according to its own discretion. The new Trustees constitute a majority of the Board, and if their appointment was void all their acts are void, and among their acts must of course have been the vote filling of vacancies in the Board. But one of the original members of the Board of Trustees is now a Trustee, the rest are all new Trustees, holding their position either, (according to the premises) by an unconstitutional legislative appointment, or by the election of a body, a majority of whom were incapable, because they held their offices by an unconstitutional appointment. This was the condition of things when the Act of 1854 was passed. Of the legal constitutional corporation, there was, as before remarked, but a single Trustee, and he of course, incapable of holding an election, or of performing any other corporate act. The corporation was then defunct, and incapable of self-resuscitation. The Legislature alone could revive it, and it could revive it upon its own plan, and direct the mode of a new organization. But we do not put the decision upon this view of the case. We think that the Act of 1821 did not create a corporation of the class that is protected from Legislative interference by the Constitution of the United States.

The second ground of demurrer is, that the Board of Trustees chosen under the Act of 1854, never legally organized.

This ground is answered by the allegations in the bill, which cannot be controverted in this demurrer.   Ten Trustees were elected by the grand jury under the Act of 1854.   Four of them refused to accept the appointment, but the other six met and organized, engaged a teacher and took charge of the Academy building.   The six, being a majority of the ten, performed these acts.   Without pausing to enquire whether the Board of Trustees consisted properly of ten, it is quite sufficient to say that the Legislature considered and recognized the six as a competent Board, by directing the Treasurer to pay teachers employed by them—referring to them as the Board elected under the Act of 1854.   *Acts of* '56, 299.

We will, however remark, that the title of the Act of 1823, under which two Trustees were added to the Board is, "An act to authorize the Commissioners of Glynn Academy to established free schools in said county."   It has no reference to the appointment of Trustees.   The Act of 1838, which appoints five additional Trustees, is subject to the same objection.   But the Board elected by the grand jury having been recognized by the Legislature as a legal Board, is sufficient to establish the number which should constitute it without deciding upon former legislation in reference thereto.

The third ground of exception is on the point made in the demurrer, that the Trustees can only act by a majority of the whole number, and it does not appear that a majority have given their sanction to the filing of the bill.

It is true that less than a majority of a board of Trustees cannot do a corporate act unless the charter declares otherwise, but it is also true that when a suit is brought in the name of a corporate body, it is to be presumed to be authorized by the body.   If the suit be in the names of members of a corporate body, and they are less than a majority, it cannot be the suit of the corporation, unless the act creating it authorize a less number than a majority to sue as the corpo-

ration. There is no such authority in this act of incorporation, and the suit being by five, when the board of Trustees consists of ten, the suit cannot be sustained by them as the suit of the corporation. Upon the charges in the bill, however, they may proceed with their suit in their individual names, as citizens of the county of Glynn, and in behalf of the rest of the citizens of Glynn county, by amending their bill, so as to conform to this decision. The complainants, as the bill will stand, can have no higher claim to the possession of the property and funds of the Academy, than other citizens of Glynn county, but as *cestui que trusts*, they can have an account of the property and funds in which every citizen of Glynn county has an interest, from those who have them in hand and have assumed, whether rightfully or wrongfully, to manage and control them. They can ask a decree in regard to the matters charged in the bill, and the funds may be secured, and the Court by its decree can compel their application to the objects for which they were given.

In regard to the fourth and last ground, to-wit: That a *quo warranto*, being a proper and sufficient remedy for complainants, Equity has no jurisdiction, it is sufficient to remark, that the government is not moving in this matter, and has not ordered an information to be filed against the defendants; that a *quo warranto* tries the right only, and gives no relief for breach of trust; that defendants are bound to answer to the grave charges made against them of breach of trust; and there can be no difficulty in settling the right before a Court of Chancery.

Judgment affirmed.