STATE, EX REL. GEORGE H. FAIR, V. KELLEY W. FRAZIER.

[FILED JANUARY 7, 1890.]

1. **Quo Warranto:** OTHER REMEDIES CUMULATIVE. In an action upon an information, in the nature of *quo warranto*, wherein it is claimed that the relator and plaintiff was elected to the office of county attorney, and the defendant had, during the term, intruded and usurped the said office, *held*, that the provisions, of the election law entitled "Contesting Elections" is cumulative, and is not an exclusive remedy.

2. ———: COMPLAINANT MAY INSTITUTE. In such action, the information may be filed by the complaining party when, if brought in the supreme court, the attorney general, or, if in the district court, the county attorney, having been requested, shall refuse to appear and file it.

3. ———: SUPREME COURT: JURISDICTION. The supreme court has original jurisdiction in an action in the nature of *quo warranto* to determine conflicting claims to a public office.

4. ———: SERVICE OF WRIT. A writ issued by the supreme court, or under its authority, may be legally served in any county in the state.

5. **Indians:** CITIZENSHIP. Under the provisions of the first clause of section 6 of the act of congress entitled "An act to provide for the allotment of lands in severalty to Indians," etc., approved February 8, 1887, in order to establish an Indian's right to citizenship, and hence to vote at an election in this state, *held*, that it must be proven that such Indian was born within the territorial limits of the United States, and that an allotment of land, in fact, has been made to such Indian by the government of the United States in pursuance of said act, or of like authority of law, or treaty of the United States.

ORIGINAL action in nature of *quo warranto.*

*J. B. Barnes, Mell C. Jay,* and *John T. Spencer,* for relator:

The supreme court has jurisdiction of the subject-matter and of the person of respondent. (Const., art. 5, sec. 2; *State*

*v. Allen*, 5 Kan., 213; *State v. Wilson*, 30 Id., 661.) The statutory remedy by contest is merely cumulative. (Comp. Stats., ch. 71; *Kane v. People*, 4 Neb., 509, 513; *State v. Griffey*, 5 Id., 161; *State v. Stein*, 13 Id., 530.) Indians are aliens, acknowledging no allegiance to state laws and exempt from taxation thereby. (*Cherokee Nation v. Georgia*, 5 Pet. [U. S.], 1; *Worcester v. Georgia*, 6 Id., 515; *U. S. v. Rogers*, 4 How. [U. S.], 567; *U. S. v. Holliday*, 3 Wall. [U. S.], 407; *Case of Kansas Indians*, 5 Id., 737; *Elk v. Wilkins*, 112 U. S., 99.) Their alien character cannot be divested at their own election; they can be made citizens only by act or assent of congress. (*Wilson v. Wall*, 6 Wall. [U. S.], 83; *Gray v. Coffman*, 3 Dill. [U. S.], 393; *Hicks v. Butrick*, Id., 413; *Elk v. Wilkins, supra; U. S. v. Osborne*, 6 Sawyer [U. S.], 406, 409; *U. S. v. Joseph*, 94 U. S., 614, 618.) Indians on a reservation are not citizens, but independent tribes. (*Goodell v. Jackson*, 20 Johns. [N. Y.], 693; *Holden v. Joy*, 17 Wall. [U. S.], 211; *Strong v. Waterman*, 11 Paige [N. Y.], 607.) They are subjects merely. (7 Opinions of Attys. Gen., 749.) The petition upon which the so-called Winnebago precinct was formed, was not signed by a majority of the legal voters as required, and the proceeding is void. (*Robinson v. Mathwick*, 5 Neb., 255; *Doody v. Vaughn*, 7 Id., 31; *Cheney v. Dakota County*, 22 Id., 437.) When but one mode of action is prescribed for the board, all others are excluded. (*Stewart v. Otoe County*, 2 Neb., 177; *S. C. & P. R. Co. v. Washington County*, 3 Id., 42; *People v. Com'rs*, 4 Id., 157.)

*Davis & Gantt*, for respondent:

As the relator is a private individual, the district court for the county where he resides has exclusive jurisdiction. (*Lowes v. Thompson*, 34 Ohio St., 365.) As the provisions of our law relative to *quo warranto* were taken from the Ohio Code, the above case is conclusive here. (*Franklin v. Kelly*, 2 Neb., 104; *Tyler v. Tyler*, 19 Ill., 151; *Drennan*

State, ex rel. Fair, v. Frazier.

*v. People,* 10 Mich., 175, 177 ; *Harrison v. Sager,* 27 Id., 476 ; *Daniels v. Clegg,* 28 Id., 33; *Favinte v. Booth,* 17 O. S., 153; *Draper v. Emerson,* 22 Wis., 150.) The Nebraska cases cited by relator do not decide the question of jurisdiction, and the Kansas cases are based upon a statute different from ours. Relator has an adequate remedy at law which is exclusive and deprives the supreme court of jurisdiction in this case. (McCrary, Elections [2d Ed.], sec. 285a; *Dickey v. Reed,* 78 Ill., 261 ; *Moore v. Hoisington,* 31 Id., 243 ; *Bell v. Templin,* 26 Neb., 249; *State v. Oleson,* 15 Id., 247 ; *State v. Marlow,* 15 Ohio, St., 114; *Wetmore v. Stewart,* 26 Id., 216.) Naturalization may be accomplished under the general law providing therefor or by a special act of congress. (*Dred Scott v. Sanford,* 19 How. [U. S.], 393 ; *People v. Washington,* 36 Cal., 658.) The rights of citizenship were conferred upon the Winnebagos by the Dawes act of 1887, and all the members of the tribe who voted at this election had either received their lands in severalty or were children of those who had done so.

COBB, J.

The attorney general having declined to appear for the state, the relator brought his original petition in *quo warranto* against Kelley W. Frazer, of Dakota county, alleging that he is a citizen of the United States, and of the state of Nebraska, and a duly qualified elector and resident of the county of Dakota, in said state, and was such on the 6th day of November, 1888, and at that time possessed all the qualifications required by law to enable him to hold the office of county attorney in and for said county.

He further alleges that the election was held on the 6th day of November, 1888, in said county of Dakota, and in accordance with the provisions of law, at which election relator was a candidate for said office in said county, and within the proper and legal limits and boundaries of said

county received 714 votes for said office; that defendant was also a candidate for said office, and within said limits and boundaries received 627 votes, and no more; that relator received a majority of the votes cast at said election within said county of Dakota, amounting to 87 votes, and was therefore duly and legally elected to said office for the ensuing two years.

Further alleges that lying south of and contiguous to the said county of Dakota there is a certain territory and tract of country comprising about seven townships of land, known as and called Omaha and Winnebago reservation; that said tract of country was set apart and ceded to the said tribes or nations of Indians by an act of congress and by treaty with said tribes of Indians, which treaty and act was ratified and confirmed on the 21st day of June, 1854; that said tribes or nations of Indians since said date have owned, occupied, and possessed said tract of country, and still own and possess the same as their reservation and permanent home; that said tribes are in charge of and under the custody, care, and control of an agent, appointed by the president of the United States, who is in charge of the agency on said reservations, established and maintained under the laws of the United States.

Further alleges that the Winnebago tribe or nation of Indians has not abandoned its tribal relations, but still keeps up and maintains the same; that they have not adopted the habits of civilized life, and taken their lands in severalty, nor received patents therefor; that they had not done so prior to the said 6th day of November, 1888, as provided by the act of congress known as the Dawes bill, passed and approved February 8, 1887; that none of said Winnebago tribe or nation of Indians were citizens of the United States, and none of the members of said tribe were citizens of the state of Nebraska, and are not and were not electors of the county of Dakota on the 6th of November, aforesaid, and were not entitled to vote in the

said county of Dakota, nor for any candidate for the office of county attorney of said county; that of the Omaha tribe or nation of Indians who claimed to have taken their lands in severalty, and who have received patents therefor, and who claimed to be citizens of the United States, under and by virtue of the act of congress, aforesaid, there were twenty-eight who voted on the said 6th day of November, 1888.

Plaintiff further alleges that the legislature of the state of Nebraska, held during the year 1879, passed an act pretending, or attempting, to attach said reservation to the said county of Dakota for election, revenue, and judicial purposes, and claims that said act is unconstitutional and void.

Plaintiff further alleges that twelve days preceding the day of election there was presented to the board of commissioners of Dakota county a petition asking and praying the board to establish a voting precinct or polling place at the government agency, aforesaid, to be known as and called Winnebago precinct, which petition was signed by only twenty-one persons, eight of whom were government employes, temporarily staying on said agency, in the employ of the United States; that the board of commissioners established the precinct or voting place, as prayed for, under the name of Winnebago precinct; that no precinct officers were appointed or elected for said precinct previous to November 6, 1888; that the county clerk of the county of Dakota—said county not being under township organization—did not make out and deliver, twenty days prior to the holding of said election, nor at any other time, a notice of said election, to be posted in said precinct; that no notice of such election was ever posted by the sheriff in said precinct, and that said precinct was not formed in time to have notices of election posted ten days prior to the time of holding said election, as provided by law; and claims that all the proceedings in relation to the establishing of said precinct were illegal and void, and conferred no right

or authority upon any of the inhabitants of said precinct to vote at said election; that 250 votes for the office of county attorney were cast at said precinct by the Winnebago and Omaha tribes of Indians, and the government agents and employes stopping at said agency; that of this number defendant received 193 votes and the relator 57 votes; that said votes were counted and returned to the county clerk and were canvassed by the board of canvassers of said county, which gave defendant a majority of 49 votes; that defendant was wrongfully and unlawfully declared elected to the office of county attorney, in and for Dakota county, for the ensuing two years, and the certificate of election was issued and delivered to him by the clerk of Dakota county.

Further alleges that J. F. Warner, the agent in charge of said Indians, his son, M. M. Warner, one William Hedges, A. H. Baker, McCuin, Fitzpatrick, and other government employes amounting to twelve persons, temporarily residing at and having charge of said agency, wrongfully and fraudulently voted at said polling place for the defendant, and their votes were canvassed and returned for the defendant without any authority of law.

Further alleges that at St. John's precinct, at said election, ten illegal votes were cast and counted for defendant.

Further alleges that the relator, at the election aforesaid, received a majority of all the legal votes cast at said election, and was duly and legally elected to the office of county attorney, of said county, for the period of two years from the 3d day of January, 1889; that the relator duly tendered his official bond to the proper authority, and demanded possession of said office from defendant, and defendant refused and still refuses to deliver possession of the office to relator.

Prays judgment that the defendant be declared not elected to said office; that he be ousted therefrom and the relator be declared entitled to the same and installed therein.

To this information defendant files his answer and alleges:

First—That he was not at the commencement of this action a resident of, nor within the county of Lancaster, nor was a service of summons had on him therein.

Second—That the action was brought against defendant by a private individual, and not by the attorney general of the state; that in actions of *quo warranto* brought on the relation of a private individual the district court of the county in which defendant resides has exclusive jurisdiction; that the defendant is a citizen of and resides within Dakota county; that no service of summons has been made within Lancaster county, nor has said defendant accepted service within said Lancaster county, for reason of which this court has no jurisdiction to try the case.

Further alleges that plaintiff has a full, complete, and speedy remedy at law. Further answering, admits that plaintiff is an elector and resident of Dakota county, and has the qualifications necessary to hold the office of county attorney.

Answering to the second count, admits that the election was held on the 6th of November, 1888, and that plaintiff and defendant were opposing candidates for the office of county attorney. Denies each and every other allegation in said count contained.

Answering third count, denies each and every allegation therein contained, and further answering to said count alleges that by an act of congress approved February 21, 1863, it became the duty of the secretary of the interior to allot to said Indians in severalty lands which they may respectively cultivate and improve, not exceeding eighty acres, to each head of a family other than chiefs, to whom larger amounts may be made, which lands when so allotted shall be vested in said Indians and their heirs without the right of alienation, and shall be evidenced by patent; said act further provided said Indians should be subject

to the laws of the United States and the criminal laws of the state or territory in which they may happen to reside; that said Indians, in accordance with the treaty made March 8, 1865, were removed to the state of Nebraska, and to the lands which they now occupy, and which lands are part of the same out of which said Winnebago precinct was created; that afterwards in pursuance of said act and treaty, and on the 22d of November, 1872, patents were issued to said Indians as provided in said act for said lands, which patents included a part of the lands out of which said precinct was formed, and upon which the Winnebago Indians, who voted for defendant at the November, 1888, election, resided at said time and did so reside thereon for a long period preceding said election after receiving their patents. Further answering said count, alleges that by an act of congress approved August 7, 1882, and relating to the Omaha tribe of Indians, it was provided in the said act that certain lands therein described should be allotted in severalty to said Indians, and after approval of said allotments by the secretary of of the interior said secretary should cause patents of said lands to be issued to said Indians; that upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of said tribe of Indians shall have the benefit of and be subject to the laws, both civil and criminal, of the state of Nebraska, and that said state shall not pass and enforce any law denying any Indians in said tribe the equal protection of law; that in pursuance of said act allotments were made of said lands to said Indians on the 29th of December, 1884, patents were issued therefor as provided in said act; that the said patents included the land upon which the Omaha Indians, who voted at the November, 1888, election, reside, and the same is within a part of the Winnebago precinct aforesaid; and that said Indians have been, and at the time of the election and for a number of years previous thereto, residents of the land located and within said precinct. Further answering

said count defendant alleges that by an act of congress approved February 8, 1887, it was provided in section 6 of said act that upon the completion of said allotments and the patenting of the lands of said allotees, each and every band or tribe of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, in the state or territory in which they may reside. And no state or territory shall pass or enforce any law denying any such Indians within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotment shall have been made under the provision of this act, *or under any law or treaty*, and every Indian born within the territorial limits of the United States who has voluntarily taken up within said limits his residence, separate and apart from any tribes of Indians therein, and adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not by birth or otherwise a member of any tribe of Indians within the territorial limits of the United States, without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property. Defendant further alleges that of about 190 votes cast for him at said election in said Winnebago precinct by the Omaha and Winnebago Indians aforesaid, all of said votes were cast by Indians who had severed their tribal relations, taken their lands in severalty, received patents therefor and adopted the habits of civilized life, and at the time of said election, and long previous thereto, were residing on and cultivating said lands and dependent upon their own labor for a livelihood, and received no aid from the government whatever excepting the annuity paid them that was derived from the sale of Minnesota lands and did not exceed the amount of $15 a year for each individual; that all of said Indians voting for defendant had resided in the state of Nebraska

for more than six months, in Dakota county for more than sixty days, and in Winnebago precinct for more than ten days preceding said election, and under and by virtue of the act approved February 8, 1887, said Indians were citizens of the United States and the state of Nebraska, and had full right to exercise the right of suffrage in said county and precinct and their votes were legally and properly received canvassed and counted for this defendant for the office of county attorney of said county.

Answering fourth count, admits that the legislature of the state of Nebraska, at the session held during the year 1879, passed an act attaching said territory to the county of Dakota for election, judicial, and revenue purposes; admits that the same became a law on the 27th of February, 1879; denies that the said act was unconstitutional and void, and avers the fact to be that said act is and was at the time of holding the election aforesaid a valid and subsisting law.

Answering fifth count, denies each and every allegation therein contained, except as hereinafter expressly admitted; avers the facts to be that the action of said board was based on three different petitions presented to them praying that they set off said territory as a voting precinct; that said petitions were signed by some 247 of the residents and voters of the territory in said petitions described, as is fully shown by copies of said petitions attached to the answer; that on the 23d of October, 1888, in pursuance of said petition, the commissioners created a precinct by the name of Winnebago precinct and the votes complained of were cast in said precinct for said office of county attorney, and other officers voted for at the general election, and said election was held in all respects in conformity to the laws governing elections. Further answering said count, defendant says that said precinct was formed from the territory attached to the county of Dakota by the act of the legislature passed and approved February 27, 1879, and that since the passage of said act, and up to the time of the

action of the commissioners as aforesaid, no precinct or voting place had been formed for the benefit and convenience of the voters residing on the territory so attached; that voters up to the time of formation of said precinct had to go a great distance at much inconvenience to exercise the right of suffrage; that said board of commissioners had full power under the law relating to the formation of new precincts to act in the premises, and under said law it was their duty to form a voting precinct for the accommodation of the voters residing in said territory without any petition therefor. Defendant alleges that notices were posted in said precinct for more than ten days preceding said election; that had no notice been posted in said precinct it would have no effect upon the legality of the votes cast; as the time of holding said election is fixed by law, and that all of the 193 votes cast, canvassed, and returned for defendant at said voting precinct were legal and valid votes cast by *bona fide* residents of said precinct, and said residents were citizens of the United States and the state of Nebraska, and had a right to vote at said election in said precinct for candidates for the various offices to be filled at said election.

Answering sixth count, denies that J. F. Warner and other parties therein mentioned were temporarily residing on said reservation; denies that said persons fraudulently and wrongfully voted; denies that said votes were wrongfully and unlawfully canvassed for defendant; avers the facts to be that said parties had resided on said reservation and made their permanent home on the same for a long period previous to the time of their voting, and had been residents of the state of Nebraska for more than six months, and had resided in the county of Dakota for more than sixty days, and in said precinct for more than ten days preceding the said election, and had full right as citizens of Nebraska and residents of said county and precinct for the requisite time to vote at said election.

In answer to the seventh count, denies that certain votes were cast in said precinct for plaintiff, which were not counted. Further answering, says that of the six Indians who voted in said precinct this defendant has no knowledge or information as to whether said Indians had the right to vote in said precinct or not, and has no knowledge or information as to whom said Indians voted for, but is informed and believes it to be true that said Indians cast their votes for the plaintiff, and said votes were canvassed and counted for the plaintiff by the canvassing board of said precinct.

Answering eighth count, denies each and every allegation therein. For further answer to the information of the relator, alleges that at the election held in Dakota county, Nebraska, on the 6th of November, 1888, for the office of county attorney of said county, defendant received 820 votes, and the relator received 771 votes; that defendant was duly declared elected to the office of county attorney, and received a certificate of election, duly qualified; filed the bond required by law, and entered upon the duties of said office at the time required by law, and has ever since, and now is performing the duties of said office, and is lawfully and legally entitled to said office for the term of two years; denies that the relator was elected to said office of county attorney of Dakota county, or has any right or claim thereto. Defendant prays that said office and its privileges and franchises may be adjudged to him and for his costs.

To this answer plaintiff for reply alleges that the supreme court of the state of Nebraska has original jurisdiction of the subject-matter of this action and the parties thereto, and the district court of Dakota county has not exclusive jurisdiction of this matter; that defendant accepted service of the summons of this court in this cause, and has duly appeared and answered to the merits of this action; that the relator had not at the time of the com-

29

mencement of this action an adequate remedy at law. Relator admits that under the provisions of the act of congress, approved February 21, 1863, and of the treaty approved March 8, 1865, as alleged in the answer, the Winnebago Indians removed to the state of Nebraska, and to the lands which they now occupy; and alleges that of the Indians that voted at the election in Winnebago precinct on the 6th day of November, 1888, but 34 had received patents under the provisions of the act of congress and the treaty aforesaid, and of the 34 Indians thus voting but 7 had received and retained patents to their allotments made as aforesaid, and all other Winnebago Indians who voted at said election voted by virtue of the allotments made under the provisions of the act of congress approved February 8, 1887, and made subsequent to said date by a special agent of the government, which allotments had not been on the 6th day of November, 1888, approved by the government of the United States, and patents issued therefor; relator further admits that the Omaha tribe, or nation of Indians, were entitled to vote at the election held on the 6th day of November, and further alleges that less than thirty of said tribe voted at said pretended precinct for the candidate for the office of county attorney of Dakota county.

Further replying, relator admits the provisions of the act of congress, approved February 8, 1887, as in said answer alleged, but denies that the Winnebago Indians who voted in said precinct had taken their lands in severalty, and received patents therefor; denies that said Indians had severed their tribal relations and adopted the habits of civilized life; denies that they are dependent upon their own labor for a livelihood and receive no aid from the government except the annuities derived from the sale of their lands in Minnesota; denies that said Indians became citizens by virtue of the act approved February 8, 1887; denies that they were legal voters on the 6th

of November, 1888; denies that the votes cast by said Indians were legally and properly cast and counted for defendant therein; alleges that said Indians are under the care and control of the agent appointed by the government of the United States; that through said agent they receive aid from the government of the United States in the matter of annuities and supplies; that they are not now and never have been since their settlement in Nebraska self-supporting; their farms are stocked, their buildings erected, and seeds, grain, and implements furnished them by the government; that they maintain the customs and usages of the said Winnebago tribe, preserve their own peculiar mode of life in regard to their habitation and living, and are not and never have been amenable to the laws of said state; that they are not now, and were not on the 6th of November, performing the duties of citizens of the state of Nebraska; that they were fraudulently voted in said precinct, and said votes were fraudulently and unlawfully received, counted, and canvassed for the various county and state offices, and that none of the 210 Winnebago Indians, who voted in said precinct, were electors of the state of Nebraska, or entitled to vote at said election.

For further reply to said answer, denies that said precinct was established upon three petitions, but alleges the fact to be that the petition marked Exhibit A and the petition marked Exhibit C were filed at or near the same time they were fraudulently joined together, and were rejected by the board of county commissioners on the 21st day of October, 1888; that on the 16th of October a petition, marked Exhibit B, was filed in the office of the clerk of said county, and on the 23d day of October, 1888, the precinct was established as prayed for in said petition; that J. F. Warner, M. M. Warner, Wm. Hedges, Fitzpatrick, McCuin, A. H. Baker, and John W. Nunn were government employes, and are not, and were not at the time they signed said petition, *bona fide* electors and resi-

dents of said precinct, but were residing on said reservation for the purpose of their employment only; that M. J. Fitzpatrick and Wm. Hedges, who made the affidavit to said petition, and were signers thereof, were government employes at the time of signing said petition and making the application aforesaid. That the acts of the board of commissioners of Dakota county, in establishing such precinct, were illegal and void, and conferred no right or authority upon any residents of said precinct to vote at said election. Admits that said precinct was formed from the territory which the legislature of the state of Nebraska, by act approved February 27, 1879, attached to said county; but denies that notices of said election were posted in said precinct ten days before said election, or at any other time; denies any part of the 193 votes cast for said defendant, by the said Winnebago Indians, or by said government agents and employes, in said precinct, were legal votes; denies that said Indians and government agents and employes had the right to vote at said election; denies that J. F. Warner, M. M. Warner, A. H. Baker, M. J. Fitzpatrick, W. A. McCuin, William Hedges, and John W. Nunn were residents and electors of said precinct. Alleges that they were residing there for the purpose of said appointment, and had no right to vote in said precinct for any candidate.

Further replying, denies that the defendant received a majority of the legal votes cast at said election for the office of county attorney, or that he received 820 legal votes. Alleges that the votes so counted and canvassed for the defendant included the 193 votes of the said Winnebago Indians and the government agents and employes in said precinct, and that this relator received a majority of eighty-seven of all the legal votes that were cast at said election; that he was duly and legally elected to the office of county attorney of Dakota county, for a term of two years from the 3d day of January, 1889.

There are three important questions presented by the record in this case : First, as to the procedure. This branch of the case presents questions : First, the jurisdiction and power of the supreme court to hear and determine original actions of *quo warranto ;* to inquire by what right a respondent holds a county office.

Article 6 of the constitution of the state is devoted to the judicial department, and section 2 thereof to the supreme court, and provides as follows : " It shall have original jurisdiction in cases relating to the revenue, civil cases in which the state shall be a party, *mandamus, quo warranto, habeas corpus,* and such appellate jurisdiction as may be provided by law."

Section 1 of chapter 71 of the Compiled Statutes provides that "When any citizen of this state shall claim any office which is usurped, invaded, or unlawfully held and exercised by another, the person so claiming such office shall have the right to file in the district court an information in the nature of a *quo warranto* upon his own relation, and with or without the consent of the prosecuting attorney, and such person shall have the right to prosecute said information to final judgment; *Provided,* He shall have first applied to the prosecuting attorney to file the information, and the prosecuting attorney shall have refused or neglected to file the same."

Section 4 of said chapter provides that " Proceedings in the supreme court in applications for *mandamus* shall be regulated by chapter 3 of title 18 of the Code of Civil Procedure, in applications by *quo warranto* by title 23 of said Code, and in application for *habeas corpus* by chapter 25 of the Criminal Code ; and all other provisions of law relating to those remedies shall be applicable to said proceedings when had in said court exercising its original jurisdiction."

Section 5 provides that " The several district courts shall have and exercise concurrent jurisdiction with the supreme

court in the several kinds of action enumerated in the foregoing section and the mode of proceeding and the practice relating thereto shall be the same as that obtaining in the supreme court as herein provided and as now provided by law."

Title 23 of the Code of Civil Procedure provides as follows:

" Sec. 704. An information may be filed against any person unlawfully holding or exercising any public office or franchise within this state, or any office in any corporation created by the laws of this state, or when any public officer has done or suffered any act which works a forfeiture of his office, or when any persons act as a corporation within this state without being authorized by law, or if, being incorporated, they do or omit acts which amount to a surrender or forfeiture of their rights and privileges as a corporation, or when they exercise powers not conferred by law.

" Sec. 705. Such information may be filed by the prosecuting attorney of the proper county whenever he deems it his duty so to do.

" Sec. 706. He must file such information when directed to do so by the governor, the legislative assembly, or the district court."

The remaining sections are devoted to matters of detail.

When these provisions of law are grouped and considered together, it is clear that the supreme court has jurisdiction of the case at bar, a jurisdiction derived from the constitution which no statute could take away, and of which no statute has sought to deprive it. It is equally clear that the relator, having applied to the attorney general to file said information and that officer having refused, had the right to file it himself. That the respondent, being a citizen and resident of Dakota county, cannot he be sued in the supreme court which holds its sessions and keeps its records in Lancaster county, and can

a summons issued by the clerk of said court in Lancaster county be served on the respondent in Dakota county and thereby confer jurisdiction of the person of respondent upon said court? The supreme court has no other or greater jurisdiction in the county of Lancaster than it has in the county of Dakota, or any other county of the state. Any writ that may be issued under its authority may be served in any county of the state, and no question of local citizenship, or domicile, can grow out of the fact of such service being made in one county rather than another. These propositions are so self-evident, and the conclusions so irresistible, that any analysis, or discussion, of them is deemed superfluous. No purpose would be served by a discussion of the case of *State, ex rel. Lowes, v. Thompson,* 34 O. S., 365, cited by counsel for respondent. We are all of the opinion that that case cannot be followed in this state.

Counsel for respondent cite section 60 of the Code of Civil Procedure, which reads as follows: " Every other action must be brought in the county in which the defendant, or some of the defendants, resides, or may be summoned." This section is part of title IV of the Code, which is entitled " The county in which actions are to be brought." The nine sections of said title occurring before the section now under consideration are devoted to actions of which the district courts have exclusive original jurisdiction, and the three that follow are devoted to provisions for a change of venue in causes in the district courts, and the transfer of such causes from the district court of one county to that of another. These provisions, including those of section 60, must be held to apply exclusively to proceedings in the district courts, except where, by other provisions of law, proceedings in other courts are made applicable to them. It would be contrary to the spirit of our laws to accord to the supreme court a jurisdiction in one county denied to it in all the

rest, or to limit the running of its writs and process to the county in which the court holds its sessions and keeps its records and office of its clerk.

The next point raised by the respondent and discussed in the brief of counsel is to the effect that the relator should be denied his remedy by *quo warranto*, for the reason that he has an adequate remedy at law.

The case of *Kane v. The People*, 4 Neb., 509, would seem to be decisive of this point in favor of the relator. But counsel for the respondent contends that the force of this opinion is weakened, if not broken, by the fact that in the constitution of 1875 there is no express grant of common law and chancery jurisdiction to the supreme court. It is true that a part of the argument of the learned judge, who delivered the opinion of the court in that case, was based upon the provision of the constitution of 1867, giving to the supreme and district courts both chancery and common law jurisdiction. Yet it is observed that his conclusion was foreshadowed and manifest from his argument before he reached that part of the decision.

Section 64 *et seq.* of chapter 26 of the Comp. Stats. entitled "Elections" provides for contesting elections; section 70 gives the district courts of the respective counties power to hear and determine contests of the election of county judge and in regard to the removal of county seats, etc., and section 71 provides that "The county courts shall hear and determine contests of all other county, township, and precinct officers," etc. This embraces county attorneys. The statute, nowhere, in terms, makes these provisions exclusive of all other remedies. So that if they are to be so considered, it must be by force of that general proposition so often invoked, and laid down with more or less accuracy, that neither injunction in equity, nor *mandamus* at law, can be resorted to where the party aggrieved can obtain full and adequate relief in the usual course of proceedings at law, or by the ordinary forms of civil action. Mr.

High, in his work on Extraordinary Legal Remedies, at sec. 617, says that "A striking analogy exists between the remedy by *quo warranto* information and the extraordinary remedies" above referred to. He also lays down the rule that "where a specific mode is provided by statute, * * * and a specific tribunal is created for that purpose, and the method of proceeding therein is fixed by law, resort must be had to the remedy thus provided, and proceedings by information in the nature of a *quo warranto* will not be entertained." The author cites to the above: *State v. Marlow*, 15 Ohio S., 114; *State v. Taylor*, Id., 137; *Commonwealth v. Henszey*, 81* Pa. St., 101; *People v. Every*, 38 Mich., 405; *State v. Wadkins*, 1 Rich. (S. Car.), 42; *People v. Whitcomb*, 55 Ill., 172; *People, ex rel., v. Ridgley*, 21 Ill., 66; *Dart v. Houston*, 22 Ga., 506; *People v. Hillsdale & Chatham Turnpike Co.*, 2 Johns., (N. Y.), 190. I have examined all of the above cases except *People v. Whitcomb*, 55 Ill., which I do not find in the library, and do not find any one of them to sustain the text, with the exception of *State v. Marlow*, 15 Ohio State R., which is the case discussed by Judge LAKE in *Kane v. The People, supra.*

I am therefore of the opinion that the remedy by contest under the provisions of the statute above cited, in cases like the one at bar, is a cumulative and not an exclusive one, and that the objections to the procedure by *quo warranto* and to the jurisdiction of this court to hear and determine it must be overruled.

I will pass over, at least for the present, the consideration of the act of the legislature by which it was sought "To attach a portion of what is known as the Winnebago and Omaha reservations in the state of Nebraska to the county of Dakota for election, judicial, and revenue purposes," also the question of the legality of the organization of Winnebago precinct in said county, and proceed to the consideration of what is conceded to be the main question in the case—the right of the Winnebago Indians to

vote at the election at which the relator claims to have been elected.

By the constitution of this state, article 7, section 1, "Every male person of the age of twenty-one years or upwards, belonging to either of the following classes, who shall have resided in the state six months, and in the county, precinct, or ward for the term provided by law, shall be an elector: First, citizens of the United States. Second, persons of foreign birth who shall have declared their intention to become citizens, conformably to the laws of the United States on the subject of naturalization, at least thirty days prior to an election."

Section 3, of chapter 26, of the Compiled Statutes provides that "Every male person of the age of twenty-one years or upwards, belonging to either of the following classes, who have resided in the state six months, in the county forty days, and in the precinct, township, or ward, ten days, shall be an elector: First, citizens of the United States. Second, persons of foreign birth who shall have declared their intention to become citizens conformably to the laws of the United States on the subject of naturalization, at least thirty days prior to an election."

It is not contended, nor can it be, that the Indians, or any of them who voted for the respondent, belong to the second class. The sole question, then, presented by this branch of the case is, Do they belong to the first class; are they citizens of the United States?

An act of congress entitled "An act for the removal of the Winnebago Indians and for the sale of their reservation in Minnesota for their benefit," approved February 21, 1863, after making various provisions, not deemed necessary to set out here, proceeds as follows: "And it shall be the duty of the secretary of the interior to allot to said Indians in severalty, lands which they may respectively cultivate and improve, not exceeding eighty acres to each head of a family other than to the chiefs, to whom

larger allotments may be made, which lands, when so allotted, shall be vested in said Indian and his heirs, without the right of alienation."

On the 8th day of February, 1887, there was approved an act of congress entitled "An act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the territories over the Indians, and for other purposes." Section 6 provides "That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made, shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside; and no territory shall pass or enforce any law denying any such Indian, within its jurisdiction, the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotments shall have been made, under the provisions of this act, or under any law or treaty * * * is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizen. * *"

Without entering the indubitable field of discussion against this attempt of the federal legislature to establish a *special* rule of naturalization applicable alone to certain individual members of certain Indian tribes, let us see whether the Indians who voted at the said election are shown to be within the provisions of said act.

It appears from the record that "it was stipulated and agreed by and between the parties at the taking of the testimony, that in Winnebago precinct, of the two hundred and fifty votes cast at the election on November 6, 1888, the plaintiff received fifty-seven votes for the office of county attorney of Dakota county, Nebraska, and the defendant received one hundred and ninety-three votes for

the said office, and that the following is a list of the names of the persons voting at said election for said office." Here follows a list of about one hundred and ninety-two names.

Jesse F. Warner, Indian agent at the Winnebago and Omaha agency, was sworn and examined as a witness first on behalf of the plaintiff. After the preliminary questions he was asked by plaintiff's counsel as follows: '

Q. I will get you to examine this book and state what it is.

A. Yes, sir; it is what is known as the allotment book; of the allotment of the Winnebagos of land in severalty.

Q. To the Winnebago Indians?

A. Yes, sir.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. Does that book contain the entry of the allotments of land to the Winnebago tribe or nation of Indians in severalty in Nebraska on there?

A. No, not the allotment in severalty, not the whole of it, not under the law as it now is.

Q. No, I mean under the previous law up to the law known as the Dawes bill.

A. Yes, sir; up to the former law I presume it contained the names; it was sixteen years ago. It was the allotment then, and that allotment was, to a certain extent, continuous from that time on. I delivered some patents since I have been here, to the Indians, that are recorded in that book. There should be none that are not in this book.

Q. Now you may state if you have any record in your office of any allotments made under what is known as the Dawes bill.

A. Not yet.

Q. Has there been any such allotments made?

A. Why the land is selected, and the certificates giving patents have not yet issued. The allotments are not yet complete.

Q. That is under the Dawes bill of February, 1887?

State, ex rel. Fair, v. Frazier.

A. Yes, sir.

Q. Have these allotments been confirmed, and certificates issued by the department?

A. There are none issued yet, as far as I know.

Q. As far as you know the allotments are not complete?

A. Yes, sir. As far as I know we have no office record of any patents having come here yet.

Q. Now, was that the situation of affairs that you have just testified to, at the time of the holding of the election on the 6th day of November, the last general election, the county election, was that the situation of affairs?

A. The land was not all selected at all under the Dawes bill under the new allotment, under the bill or act of congress of February. 1887.

\* \* \* \* \* \* \* \*

Hereupon the counsel for the plaintiff offers in evidence all of the above identified book, beginning with the first entry on page 35 thereof to the note of page 94, as identified by the reporter, showing what patents were issued and that all of the patents were issued and dated October 22, 1872. There being no objection the same was received in evidence and marked Exhibit " A."

\* \* \* \* \* \* \* \*

Q. You may state whether or not there has been any collection of all the patents that has been issued prior to the passage of the Dawes bill, under the laws prior to that bill, whether any collection of these patents has been made?

A. Since that time?

Q. Yes, sir; since the patents were issued.

A. Under these second allotments, all of these patents that could be got hold of were collected.

Q. By whom?

A. A special agent appointed for the purpose.

Q. What was her name?

A. Alice C. Fletcher.

Q. When was that done—since you have been agent?

A. Yes, sir; she was here part of two years.

Q. She collected these patents and identified the patentees as far as she could?

A. Yes, sir.

Q. How many did she collect, if you know?

A. That I cannot answer; I don't know.

\* \* \* \* \* \* \* \*

Q. Where are all the patents that have been issued?

A. They have been delivered to the patentees. Do you mean the old patents?

Q. Yes, sir.

A. No, there was quite a number that I found in the office when I came here, that were made out to persons of white names, as we term it, not Indian names, and they could not tell what Indian was meant by the name. The person making the allotments called them in and gave them papers and said to them, now your name is so and so, and the Indian could not remember the name, and the Indian name was not mentioned in the patent.

Q. There was a number that could not be identified because they were in names that way?

A. Yes, sir.

Q. Do you know how many Miss Fletcher identified as having received patents?

A. I don't.

Q. You say there are still quite a number that were not delivered in your office?

A. No, there is not now.

Q. What became of them?

A. Under instructions from the Indian department they were returned to the government.

Q. Do you know how many you returned?

A. I don't. I returned them through Miss Fletcher; she managed that; I would suppose, at a rough guess, that there was not less than twenty-five.

Q. Whatever there were she took charge of?

A. Yes, sir, and returned them as not identified. She made it her special business. They were treated by the government as void.

Upon cross-examination the witness testified that he had been Indian agent there for about three years; that he had resided at the agency, with his family, since within a month of the time of his appointment as such agent. I further quote his testimony:

Q. Now in regard to these patents. You have testified that you are familiar with that book. I will ask you if you know whether or not there were patents issued at the time you speak of in 1872, to all the Omaha Indians, over twenty-one years, at that time residing here, or dwelling here, and all the Winnebago tribe of Indians?

A. It has always been recognized that there was; they were all entitled to their allotments, and it was understood they all secured their allotments—the heads of families.

Q. That were over twenty-one years?

A. Yes, sir.

Q. I will ask you, if you know whether or not at this late election, all parties voting there all belonged to the Winnebago tribes who were parties to whom allotments were made, or rather children of them?

This question, being objected to as being incompetent, no foundation laid, nor the best evidence, and not being proper cross-examination, was not answered.

The witness was then made witness for the respondent, and examined in chief by defendant's counsel, and the last above question being again put to him, he answered over a like objection on the part of the plaintiff:

A. I know of no one voting but who was an original patentee, or the child of an original patentee.

Q. That had become of age since the issuance of these patents?

A. Yes, sir.

Q. And you were familiar with these Indians from that time you became agent, and since?

A. Yes, sir. I have been quite familiar with them.

This witness was again recalled by the plaintiff, and, *inter alia*, testified as follows:

Q. Did you know how many of these original patentees to land held their patents at the time of the election, and how many had surrendered their original patents under the old act for the purpose of taking new allotments?

A. I do not.

Q. You have no means of knowing that?

A. I have no means of knowing that. That was entirely in the hands of Miss Fletcher; they brought in their patents to find out whether they would take the land under the new allotment, or whether they would retain it under the old patents.

Q. How many were brought in that were afterwards returned?

A. I cannot tell; there were somewhere over—I don't know exactly, but somewhere over fifty, from fifty to sixty, of these old allotments that were not surrendered at all.

Q. The balance were returned for the purpose of taking out new allotments?

A. Taking allotments under the new law.

A stipulation signed by counsel for the plaintiff and respondent is filed with the record " that at the election held in Dakota county on the 6th day of November, 1888, there was cast in said county for the office of county attorney a total of 1,591 votes, of which number plaintiff received 771 votes, and defendant received 820 votes. That in Winnebago precinct, in said county, there was cast a total of 250 votes the same being a part of the above total number of 1,591, and of these votes cast at Winnebago, plaintiff received 57 votes and defendant 193 votes, said Winnebago precinct being a part of the Omaha and Winnebago Indian reservations; that the canvassing board of

said county duly canvassed the votes for said office and made return ; that of the entire vote of said county, including said Winnebago precinct, defendant, as shown by said return, received a majority of 49 votes, and a certificate of election to said office was duly issued to said defendant, and on the first day of January, 1889, said defendant entered upon the duties of said office, and since said date, and still fills said office of county attorney cf said county and has been and is performing the duties of the same."

From the evidence, it appears that all of those voting at said election, at Winnebago precinct, with the exception of six government employes, were Winnebago and Omaha Indians, making 244 votes cast by Indians. There is some attempt made by plaintiff in the examination of witnesses to distinguish between the Winnebago and Omaha Indians, but nothing intelligible was accomplished in that behalf. Deducting the 57 votes cast for the plaintiff in the said precinct from the 244 votes cast by the Indians leaves 187 votes cast by Indians for the respondent. If we deduct this number from the 820 total votes cast for him in the county as returned by the board of canvassers, it would reduce his vote to 633, being 138 votes less than the 771 cast for the plaintiff as returned by the board of canvassers.

There was no attempt made on the part of the respondent to identify the names on the poll list of Winnebago precinct with the names contained in the book of allotments. This was indispensably necessary, in order to establish the legality of the votes. I use the word establish advisedly ; because in any view of the case the members of these tribes of Indians are *prima facie* non-voters. Even under the act of congress of 1887, to constitute an Indian, except one "who has voluntarily taken up his residence * * * separate and apart from any tribe of Indians * * * and has adopted the habits of civilized life," a citizen, and so, a voter, that identical Indian must be one

30

to whom an allotment has been made.   I will not stop to inquire whether the facts necessary to establish the identity of the voter with the allottee can be proved by parol, for, as above stated, no attempt was made to prove them by any species of evidence.   It would seem that the original allotment to these Indians had been canceled and withdrawn for the purpose of making a new allotment to them under the provisions of the act of 1887, and that such new allotment has not been completed.

There was a large amount of evidence taken and reported by the referee, chiefly directed to the inquiry as to whether these Indians had or had not abolished their tribal relations with each other and adopted the habits of civilized life.   This testimony is utterly irrelevant except upon the theory that it was claimed by the respondent that these Indians were citizens, and hence voters under the second clause of the sixth section of the act of February 8, 1887, popularly known as the Dawes bill, and if so, it were only necessary to show that said Indians continue to live together on an Indian reservation and that the individual Indian has not " taken up   *   *   *   his residence separate and apart from any tribe of Indians." As to other Indians it is the allotment to them of lands in severalty by the general government which alone is claimed to make them citizens, and no amount of education, civilization, or cultivation, without such allotment, can do so.

I come to the conclusion, therefore, that none of the Indians who voted at the said election in Winnebago precinct are shown to have been citizens of the United States, or entitled to vote, under the laws of this state.   It follows, therefore, that plaintiff was duly elected county attorney for Dakota county at the general election of 1888, for the term of two years from and after the first Thursday after the first Tuesday in January, 1889, and that defendant has unlawfully usurped the said office and now is in the en-

joyment thereof, etc. A writ of ouster will be issued against him as prayed.

WRIT ALLOWED.

