WORD v. SOUTHERN MUTUAL INSURANCE COMPANY.

1. The provisions of the act of November 23, 1895, now contained in section 2110 of the Civil Code, are applicable to contracts for fire-insurance made by a purely mutual fire-insurance company.

2. The amendment to the charter of the Southern Mutual Insurance Company, enacted November 23, 1866, was not the granting of a new charter to the company, and really did not make any material or substantial amendment to the original charter.

3. The provision in the charter of the company, which was granted in 1847, so restricting the company that it can not insure property for more than three fourths of its value, was neither literally nor in substance an inviolable contract between the State and the company, to the effect that the latter should never, by reason of subsequent legislation, be made liable for the full value of property insured under one of its policies.

4. As the act of November 23, 1895, applies to purely mutual fire-insurance companies, the policy-holders of such a company, present at an annual meeting of the policy-holders, can not by passing a resolution, waiving and renouncing the benefits of the act and instructing the officers and directors of the company to disregard it in making contracts of insurance for the company, prevent the act from operating upon such contracts made by the company.

5. The fact that a policy-holder in a mutual fire-insurance company, after the passage of the act of November 23, 1895, received dividends upon policies held by him in the company, which dividends were larger than they otherwise would have been, because the provisions of this act were ignored in settlements made by the company with other policy-holders for losses sustained under policies held by them, did not, after he had sustained a loss covered by his policy, estop him from insisting upon the application of the provisions of that act to the contract between the company and himself.

COBB, J., dissenting. 1. The charter of the Southern Mutual Insurance Company, as granted in 1847 (Acts 1847, p. 126), and as amended in 1849 (Acts 1849, p. 265) and 1856 (Acts 1855–6, p. 477), contains a contract between the State and the corporation, by the terms of which the company was guaranteed the right to carry on the business of fire-insurance in such a manner that the amount to be paid the insured in case of loss was not to be determined until after the loss had occurred, and the sum to be paid was in no event to exceed three fourths of the actual value of the property destroyed.

2. The act of 1895 (Civil Code, § 2110), when applied to the transactions of the company above named, having the effect of requiring the company to determine in advance what amounts should be paid to the insured in cases of loss, and also of requiring the payment to the insured of more than three fourths of the value of the property destroyed, if the amount stated in the policy exceeds that sum, and in any event having the effect of substantially changing the plan of business and method of operation provided by the charter, impairs the obligation of the contracts contained in the charter, and is therefore, as to the affairs of that company, inoperative.

3. The amendment to the charter passed in 1866 (Acts 1866, p. 80) was not the grant of a new charter to the company, and the acceptance of such amendment did not bring the company within the provisions of section 1682 of the

Code of 1863, which declared : "In all cases of private charters hereafter granted, the State reserves the right to withdraw the franchise, unless such right is expressly negatived in the charter." Civil Code, § 1880.

Argued October 8, 1900. — Decided January 25, 1901.

Action on insurance policy.    Before Judge Reagan.    Troup superior court.    June 18, 1900.

*W. A. Post* and *Longley & Longley*, for plaintiff.
*Erwin & Erwin*, for defendant.

FISH, J.    Frank Word sued the Southern Mutual Insurance Company for the sum of $4,000, the value of his dwelling-house, which was totally destroyed by fire while he held a policy of insurance upon it, for that amount, issued to him by the defendant company. The policy sued upon was issued to the plaintiff by the defendant on the 28th of March, 1894, and was renewed, upon the payment of the premium required, year by year.    The premises insured were destroyed by fire on the 16th of April, 1899.    The loss plaintiff sustained by the destruction of his dwelling-house was appraised at $4,000, and this appraisement was acquiesced in by both parties to the contract of insurance.    The only dispute between them was as to the amount for which the insurance company was liable to the plaintiff; he claiming that it was liable for the full amount of the loss sustained by him, and the defendant claiming that it was liable for only three fourths of this amount.    The case was, by consent of parties, submitted to the judge below upon an agreed statement of facts.    He found in favor of the contention of the defendant, and rendered judgment accordingly; to which judgment the plaintiff excepted.    Under the policy the defendant insured the plaintiff "against loss or damage by fire to the amount of four thousand dollars," for the term of one year from the date of the policy, upon his brick dwelling-house, the policy stipulating "that the funds of said company are bound and made subject to indemnify the said assured . . for all immediate loss or damage which may happen to said property by fire, within the term aforesaid, not exceeding the amount above named, and not exceeding three fourths the actual value of said property when the loss occurs."    This "three-fourths" clause was printed in larger and more conspicuous type than the rest of the policy.    The plaintiff's contention is, that, as his loss did not exceed the amount of insurance named in the policy, the insurance company is liable to

him for the full amount thereof, notwithstanding the presence in the policy of the clause by which the company sought to limit its liability to three fourths of the actual cash value of the property at the time when a loss should occur.　On the other hand, the position of the defendant is, that, by reason of the presence of this clause in the policy, it is liable to the plaintiff for only three fourths of the actual cash value of the property at the time that it was destroyed.　In support of his contention, the plaintiff relies upon the provisions of section 2110 of the Civil Code, which are taken from the act of November 23, 1895.　These provisions are as follows:　"All insurance companies shall pay the full amount of loss sustained upon the property insured by them: *Provided*, said amount of loss does not exceed the amount of insurance expressed in the policy; and all stipulations in such policies to the contrary shall be null and void."　The defendant concedes that if the provisions of this section of the Civil Code apply to the present case, the plaintiff is entitled to recover the amount which he claims, but contends that they are not applicable.

1. The defendant is a mutual insurance company, and one of its contentions is, that this section of the Civil Code is not applicable to contracts of fire-insurance made by and with a mutual insurance company.　In our opinion, this contention is not sound.　The language of the section is too broad and sweeping for such a construction to be placed upon it; it embraces "all insurance companies."　No exemption is made in favor of mutual insurance companies.　At the time that the act of 1895 was passed, the defendant company was in existence as a mutual insurance company, and carrying on its business in Georgia, under a charter granted by this State in 1847.　It is not at all probable, and is scarcely conceivable, that the General Assembly intended that this old and well-established mutual fire-insurance company, or any other mutual fire-insurance company, should be exempt from the provisions of an act in express terms applicable to "all insurance companies," when no provision for such exemption was made.　The language employed by the legislature, and subsequently incorporated in the Civil Code, precludes the idea that there was any intention that contracts for fire-insurance made by mutual insurance companies should not be affected by the provisions of the statute.　It is well settled that, unless expressly exempted by statute, mutual insur-

ance companies are included under a general law which, in its terms, applies to all insurance companies. 16 Am. & Eng. Enc. L. 24; McConnell *v.* Iowa Mut. Aid Assn., 79 Iowa, 757; State *v.* Miller, 66 Ib. 26; Sherman *v.* Commonwealth, 82 Ky. 102; State *v.* Nichols, 78 Iowa, 747; Farmer *v.* State, 69 Tex. 561; Order of International Fraternal Alliance *v.* State, 77 Md. 547; Rockhold *v.* Canton Masonic Benev. Soc., 129 Ill. 440.

2. The defendant further contends, that even if the law of this section of the Civil Code applies to mutual fire-insurance companies, it can not apply to its fire-insurance contracts, because it "is protected by its charter against the application of the act of 1895." In other words, it claims that in its charter there is a contract between the State and itself, which gives it the right, when insuring property — no matter what may be the amount of insurance named in the policy — to limit its liability under the contract of insurance to three fourths of the value of the property insured, and that the provisions of the act of 1895 can not be applied to its fire-insurance contracts without violating that provision of the constitution of the United States which prohibits any State from passing a law impairing the obligation of a contract. One reply of the plaintiff to this position of the defendant is, that by the act of November 23, 1866, it was granted a new charter, and that this new charter, being granted subsequently to the adoption of the Code of 1863, was, by reason of the provisions of section 1682 of that Code (now contained in section 1880 of the Civil Code) subject to alteration or amendment by the General Assembly. This reply of the plaintiff is without merit, for the act of November 23, 1866, was not the granting of a new charter to the insurance company, and really did not make any material or substantial amendment in the original charter. It simply amended the first section of the original act of incorporation, by providing that the company should keep its principal office in the town of Athens, in this State, unless otherwise determined by a majority of the votes of the company.

3. The provision of its charter upon which the defendant relies is found in section 3 of the act of incorporation, which provides "That said corporation may insure, for any term not exceeding ten years, any [property] against any damage or loss from fire, . . and to any amount not exceeding three fourths of the value of the property insured, and not exceeding ten thousand dollars on any

one block of buildings, or stock of goods." The defendant contends that it was here given the right, when insuring property, to limit its liability to three fourths of the value of the property when a loss occurs, no matter what may be the amount of insurance named in the policy. We do not so understand this provision of the charter. Clearly, it simply limits the extent to which the company can insure property to three fourths of the value of the property insured, and does not confer upon the company the right to insure property in any sum that it pleases, and yet limit its liability to three fourths of the value of such property. To limit the power of an insurance company to insure .property to three fourths of the value of the property is one thing, and to confer upon the company the right to limit its liability, under any contract that it may see fit to make, to three fourths of the value of the property insured, is another and a very different thing. In the one case the limitation is upon the corporate power of the company, and is made by the State; in the other the limitation is upon the liability of the company, and is made by the company. By applying the provisions of the act of 1895 to fire-insurance contracts made by the defendant company, the "three-fourths" clause in its charter is not affected in the slightest degree, for the company's power to insure property is neither diminished nor increased, and no right granted to the company is affected at all. There is no conflict between the act of 1895 and the charter of this insurance company. If the company will only insure property to the extent that it is authorized by its charter, it can never be made liable for more than three fourths of the value of the property which it insures.

If it be said, as contended in this case, that the property insured may depreciate in value between the time when the contract of insurance is entered into and the time when a loss thereunder occurs, the reply is, that the three-fourths value limitation in the charter evidently has reference to the value of the property at the time the contract of insurance is entered into. For, in any case, it would be the value of the property at the time the company exercised its power to insure which would be taken into consideration in determining whether or not the company then exceeded this power. The provisions, in section five of the charter, for ascertaining and determining, after a loss has been sustained by the insured, whether the company is liable at all to the insured, and, if liable, in what amount,

are not inconsistent with this view. The company has no power to insure property to an amount exceeding three fourths of its value; and if it insures property to an amount not exceeding three fourths of its value at the time the insurance is effected, it does not follow that the entire amount named in the policy must necessarily be paid, if a loss occurs. The property may so depreciate in value between the date of the issuance of the policy and the date of the loss as to render the loss sustained by the insured less than the amount of insurance named in the policy; or the loss may be only a partial one, and less in amount than the amount of insurance specified in the policy. In either of these events,.the company could not be required to pay more than the actual loss sustained. In estimating the loss and the amount of the liability of the company therefor, the actual value of the property destroyed should be taken into consideration; but in determining whether or not the company has exceeded the power granted to it in its charter, by insuring property to an amount exceeding three fourths of its value, necessarily it is the value of the property at the time the company issues the policy which must be taken into consideration. If the amount of insurance named in the policy is no more than three fourths of the value of the property when the insurance is effected, the company has not exceeded its power; if the amount designated in the policy is more than this, the company has exceeded its power. We are of opinion that there is neither literally nor in substance, in the charter under consideration, any contract between the State and the company which will be violated by applying to the policies issued by the company the provisions of the act of 1895.

The question whether or not the contract is ultra vires is not made in this case. It is true that one of the pleas of the defendant was that "it is restricted in the payment of losses sustained by its policy-holders to an amount not exceeding three fourths of the value of the property insured." But this was evidently not intended to be a plea that the contract, either in whole or in part, is ultra vires; for the argument in behalf of the defendant in error has not proceeded upon that theory, but has been as heretofore indicated. The company seeks not to repudiate its· contract, either wholly or partially, but contends that, giving effect to the contract just as it is written, it is only liable for three fourths of the value of the insured property at the time that the loss occurred. Even

interpreting this plea in the light of its language alone, the company pleads, not a want of power to insure property for more than three fourths of its value, but that it "is restricted in the payment of losses sustained by its policy-holders to an amount not exceeding three fourths of the value of the property insured." The charter, as we have seen, limits the power of the company to insure property, not the liability of the company to pay losses sustained by the insured. The company, having insured property to its full value, by this plea questions, not the validity of the contract which it made with the insured, but the right of the State to subject that contract to the provisions of the law which requires all insurance companies to pay the full amount named in the policy, if the loss sustained by the insured amounts to so much. The defense of ultra vires to an action on a contract, the benefits of which the defendant has enjoyed, is not considered a gracious one, is not favored by the courts, and must be clearly pleaded, to be considered. Certainly a court will not construe a plea of doubtful meaning to be a plea of ultra vires when the defendant has not placed that construction upon it. It is, therefore, unnecessary to determine whether or not the company, after having received and enjoyed the full benefits of the contract, could maintain such a defense.

4. Another defense set up was, that at the first annual meeting of the policy-holders of the defendant company held after the passage of the act of November 23, 1895, a resolution was unanimously passed that, in case it should be held that this company came within the operation of that act, the members of the company waived and renounced all benefits, if any, which they might have under said act, and authorized and instructed the officers and directors of the company "to adhere to the time-honored rule prescribed by the charter and inserted in the policies issued by the company, namely, of indemnifying the assured to an amount not exceeding that named in the policy and not exceeding three fourths of the cash value of said property when the loss occurs." The act of 1895 declared a public policy with reference to fire-insurance contracts, and, as we have seen, it was operative upon purely mutual insurance companies, as well as all others. It is too clear for argument, therefore, that the members of a mutual fire-insurance company could no more resolve the company out of the operation

of this act than the stockholders in any other fire-insurance company could, by a simple resolution, nullify the act of the General Assembly so far as it affected their particular corporation. The act being intended to apply to mutual fire-insurance companies, such companies could not escape its force and effect by any action that their members or policy-holders might take.

5. Nor is there any merit in the defense that the plaintiff was "estopped from repudiating said three-quarter clause and refusing to be bound by the same when it [was] sought to be enforced against him," because he had been from March 28, 1879, to the date when the loss sued for occurred, continuously, a policy-holder in the defendant company, during all of which time he had "received the benefit of the enforcement of said three-quarter clause against the policy-holders who . . sustained losses covered by their policies in defendant company, in the increased dividends paid in each year since he became a member of said company." If a policy-holder in a mutual fire-insurance company could, under any circumstances, be estopped from insisting upon the invalidity of a clause in his policy which the law declares shall be null and void in every fire-insurance policy where it may occur, it is very clear that the plaintiff in the present case is not estopped because, in the language of counsel for the defendant company, "he has taken since 1895 the benefit arising from the non-application of the act in the cases of all the other policy-holders who have sustained losses, in the increased dividends he has received each year." It is evident that the acceptance by him, after the passage of the act of 1895, and before the issuance of the policy now under consideration, of dividends upon policies held by him, had nothing to do with the making of the present contract. He did not, by accepting these dividends, induce the company to make this contract. The company would, in all probability, have made the same contract with him if he had never previously held a policy issued by it. He did no act and made no representation to the company by which it was misled or deceived, and upon which it acted, when it issued to him the policy sued upon.

*Judgment reversed. All the Justices concurring, except*

COBB, J., dissenting. After a mature deliberation and a careful investigation of the authorities, I have reached the conclusion that the decision of our brother Reagan, in which he held "that the

defendant is only liable to the plaintiff for three fourths of the value of the property destroyed," was correct; and therefore I am compelled to dissent from the judgment rendered by a majority of the court.   In the Dartmouth College case (4 Wheat. 517), the Supreme Court of the United States declared that the charter of a private corporation constituted a contract between the Sovereign granting the same and the incorporators; and that if the stipulations in such a charter would be binding and valid under the general rules of law governing contracts, any legislation by a State of the Union materially changing the terms of such a charter was inoperative, as being in violation of that provision of the constitution of the United States which prohibits the several States from enacting any law impairing the obligation of a contract.   In the case referred to it was said that the charter under investigation contained all the elements of a contract—that there were parties, consideration, and subject-matter; the consideration being the benefit which would flow to the public from the establishment of such an institution as was provided for in the charter of the Dartmouth College.   It would be idle at this time, as well as a work of supererogation, to question the soundness of the doctrine announced in that case.   As was remarked by Mr. Chief Justice Waite, in Stone v. Mississippi, 101 U. S. 816, "It is now too late to contend that any contract which a State actually enters into when granting a charter to a private corporation is not within the protection of the clause in the Constitution of the United States that prohibits States from passing laws impairing the obligation of contracts.   The doctrines of Trustees of Dartmouth College v. Woodward (4 Wheat. 518), announced by this court more than sixty years ago, have become so imbedded in the jurisprudence of the United States as to make them to all intents and purposes a part of the Constitution itself." Though the decision has been the subject of much adverse criticism by text-writers and judges of signal ability, it is now, and from the nature of the case must be, accepted by all of the States as a rule of law to be followed in any case in which it is applicable.   The doctrine has been often recognized and applied by this court. *Young* v. *Harrison*, 6 *Ga.* 130 (8), 156; *Adkins* v. *Thornton*, 19 *Ga.* 325 (1); *Dart* v. *Houston*, 22 *Ga.* 506 (1), 529 et seq.; *Atlantic & Gulf R. R. Co.* v. *State*, 55 *Ga.* 312; *Goldsmith* v. *Rome Railroad Co.*, 62 *Ga.* 473.   "In this connection, however, it is to

be kept in mind that it is not the charter which is protected, but only any contract the charter may contain.    If there is no contract, there is nothing in the grant on which the Constitution can act. Consequently, the first inquiry in this class of cases always is, whether a contract has been entered into, and, if so, what its obligations are." Stone *v.* Mississippi, 101 U. S. 816.

When a corporation is created by a State, the parties are the State and the incorporators, the subject-matter is the particular business for which the corporation is created, and the consideration is generally the benefit which the people of the State are supposed to derive from the presence in their midst of the enterprise which the corporation is formed to carry out.    " There is no necessity of looking for the consideration for a legislative contract outside of the objects for which the corporation was created.    These objects were deemed by the legislature to be beneficial to the community, and this benefit constitutes the consideration for the contract, and no other is required to support it." Home of the Friendless *v.* Rouse, 8 Wall. 437.    In dealing with a question of this kind, it is necessary primarily, as was said in the above quotation, to inquire what contracts are embraced in the charter, and secondly, whether the legislature has passed any act which has the effect of impairing the obligations contained in such contracts.    If the act has the effect of withdrawing or substantially modifying those obligations, against the will of the incorporators, it is unconstitutional and void.    Of course, the right to engage in the particular business which the corporation was formed to carry out is a part of the contract; the State can not compel persons incorporated for the purpose of carrying on one enterprise to abandon that business and embark in another enterprise.    Not only is this true, but the method and plan by which this business is to be carried on is itself part of the contract between the State and the incorporators.    A corporation organized for the purpose of carrying on the business of insurance can not by legislative enactment be changed, against the will of its members, into a corporation to carry on the business of a common carrier, for the simple reason that the State has granted to the incorporators the right to carry on the business of insurance.    For a similar reason, a corporation formed for the purpose of engaging in the business of fire-insurance can not be changed, without its consent, into a life-insurance organization.    And, for a like reason, a corporation which

has been organized for the purpose of carrying on the business of fire-insurance in such a way that it shall never be compelled to pay more than a certain proportion of the loss which a policy-holder may sustain can not be converted into a fire-insurance corporation which is compelled to pay in case of loss a larger amount than the proportion of loss fixed in its charter. In other words, an insurance corporation which has a right to make contracts under which the policy-holder himself assumes a portion of the risk can not be compelled to write contracts in which it assumes the whole risk. A wise public policy might require that the insured shall carry a portion of the risk, and any law which would have the effect of prohibiting an insurance company from making contracts of that character, when such a right had been previously guaranteed in a private charter, would certainly be an impairment of a contract. The proportion of loss which the company is, in such a case, required to pay is part and parcel of the contract which the incorporators made with the State at the time of the creation of the corporation. The incorporators may not have desired to embark in any enterprise other than one of that nature. There may be, and doubtless are, reasons why this kind of contract is more desirable than many others. But whether it is so or not, if the State has agreed with the incorporators that they shall have power to make this kind of contract and no other, this method of doing business is the very foundation of the enterprise, and the right to employ it arises out of a contract binding alike upon both parties. The corporation would have no right to voluntarily go beyond it; nor could the State, without its consent, force it to do so. The method and plan by which a corporation carries on its business is of the very essence of the enterprise, and any material change in this method would alter substantially the character of the corporation. The manner in which the business shall be carried on being a substantial part of the contract, any material change in this method would be an impairment of the obligation contained in the contract. "Corporate franchises are legal estates vested in the corporation itself as soon as it is in esse. They are not mere naked powers granted to the corporation, but powers coupled with an interest which vest in the corporation upon the possession of its franchises; and, whatever may be thought of the corporators, it can not be denied that

the corporation itself has a legal interest in such franchises." Society for Savings *v*. Coite, 6 Wall. 606.

Such I understand to be the principles deducible from the decision in the Dartmouth College case, and while many so-called limitations have been placed upon that decision by subsequent rulings of both State and Federal courts, so far as my investigations have gone I have found no case which places such a limitation upon that doctrine as would prevent its application to cases of the character above referred to.   See Notes on U. S. Reps., by Rose, vol. 1, p. 909 et seq.   It would be beyond the scope of this discussion to refer to all of these limitations.   An important one is found in those cases which relate to the police power of the State.   "No legislature," said Mr. Chief Justice Waite, in Stone *v*. Mississippi, supra, "can bargain away the public health or the public morals."   See also Fertilizing Co. *v*. Hyde Park, 97 U. S. 659; Thorpe *v*. R. & B. R. R. Co., 27 Vt. 140, s. c. 62 Am. Dec. 626; Platte etc. Co. *v*. Dowell, 17 Colo. 382, s. c. 30 Pac. 68; Rodemacher *v*. Milwaukee etc. R. R. Co., 41 Iowa, 297, s. c. 20 Am. Rep. 592.   The principle of the decision has been allowed to control in its full vigor in cases where the right to tax was involved.   See Piqua Branch Bank *v*. Knoop, 16 How, 369; Home of the Friendless *v*. Rouse, 8 Wall. 430; Farrington *v*. Tenn., 95 U. S. 679; Asylum *v*. New Orleans, 105 U. S. 362; *State* v. *Georgia R. R. & Bkg. Co.*, 54 *Ga.* 423. The existence of these decisions at the present time affords the highest evidence that the principle of the decision in the Dartmouth College case has not been materially shaken, at least by the Supreme Court of the United States.   It must be conceded that in the past the principle has been in some cases extended to a point where the courts at the present time would hardly go.   For instance, it has been held that a charter authorizing a lottery was protected under the principle of this decision.   Kellum *v*. State, 66 Ind. 588; Broadbent *v*. Art Ass'n, 45 Ala. 170; Boyd *v*. State, 46 Ala. 329. Of course, the general rule applied when legislative grants are under construction is applicable in cases like the present, and that is, the grant must be construed strictly as against the grantee and liberally in favor of the public.   Charles River Bridge Co. *v*. Warren Bridge Co., 11 Pet. 582; *Tuttle* v. *Walton*, 1 *Ga.* 59; *Frederick* v. *Augusta*, 5 *Ga.* 561; *McLeod* v. *R. R. Co.*, 25 *Ga.* 445; *Central R. R. Co.* v.

*Collins,* 40 *Ga.* 619; *Singleton* v. *Railroad,* 70 *Ga.* 464; *Leverett* v. *Railway Co.,* 96 *Ga.* 389.

Applying what is above said to the facts of the present case, what is the result? · We find that there was in 1847 incorporated by the General Assembly of Georgia an insurance company under the name and style of the Southern Mutual Insurance Company. Acts 1847, p. 126. An examination of the charter and the different amendments thereto will show that the scheme of the enterprise ·was one of mutual insurance. Those portions of the charter and amendments material to the present discussion were in the following language : Section 3. " Said corporation may insure, for any term not exceeding ten years, any houses, goods, or other species of property against loss or damage by fire, or water, and the lives of slaves against death, such damage, loss, or death not resulting from the carelessness, negligence, or design of the party insured, and to any amount not exceeding three fourths of the value of the property insured, property on shipboard or in storage not subject to this limitation, and not exceeding ten thousand dollars on any one block of buildings or stock of goods." Acts 1849–50, p. 266. Section 5. " Whenever any person shall sustain any loss of the property so insured, he shall, within thirty days after his knowledge of said loss, and in case of real estate before any repairs or alterations are made, give notice in writing of the same to some one of the directors, or other person appointed by the directors, whose duty it shall be to view immediately the premises where the loss occurred, or otherwise make satisfactory inquiries into the circumstances attending it, and under oath determine, in writing by him subscribed, the amount, if any, of the liabilities of said corporation for such loss; and if the sufferer shall not acquiesce in such estimate, he may, within sixty days after he· is notified of the estimate, bring an action at law against said corporation. If in this action he shall not receive more than the amount estimated as aforesaid, he shall be liable for all costs incurred in the suit, and execution shall issue against the corporation only for such amount as may be allowed, after deducting said costs of suit; but if the amount allowed be greater than the estimate, then the corporation shall be liable for all the costs of suit." The only reference in the charter to the proportion of the loss for which the company should be liable, and as to when and how this amount should be ascertained,

is contained in the sections quoted. Applying the rule of strict construction, do these sections contain a contract between the State and the incorporators? A careful reading of section 5 can lead, it seems to me, to but one conclusion, that is, that it was the intention of the General Assembly that the company should have the right to appraise the property after the loss occurred and pay three fourths of its value at the time of such loss. The decision of the majority seems to be predicated on the theory that the company was required under its charter to pay three fourths of the value of the property at the time the policy was written, but I can not agree to this construction of its charter. Section 5 provides that, whenever a loss occurs, it shall be the duty of the insured to give notice in writing to the person appointed by the directors, and that it shall be the duty of such person to examine the premises and under oath set forth in writing "the amount, if any, of the liabilities of said corporation for such loss." If the valuation was to be fixed in advance, where was the necessity for examining the premises and ascertaining the amount of liability after the loss occurred? That would already be fixed by the policy, and both parties would, under the ruling of the majority, be concluded by the amount so fixed. If section 5 does not mean that the company is to have the right to fix the valuation of the property after the loss occurs, it has no meaning whatever.

This being true, the provisions of the charter constitute, in effect, a binding agreement between the State and the incorporators, that the business they shall carry on shall be one of insurance against loss or damage by fire, etc., and that in carrying on this business they shall not be compelled to ascertain, in advance of the loss, the value of the property or the amount that shall be paid to the policy-holder, but the amount, whatever it may be, shall be determined after the loss occurs and in the manner prescribed in section 5 of the charter. The company under its charter has a right to insure for a term of ten years. The property which the company insures depreciates in value from year to year, some property more than others. The construction placed upon the charter by the majority would require the company in each case to fix the valuation of the property in advance, and in any event pay three fourths of this amount, although the actual value at the time of the loss might be less than three fourths of the amount stated in the policy. Such a

contract would, in the absence of express legislation authorizing it, be contrary to the policy of our law, which regards an insurance contract as one of indemnity only.   The right to fix the value of the property after the loss occurred, and to pay as the indemnity three fourths of the value at the time of the loss, was a very important and substantial right.   If the value of the property be determined in advance and placed at such an amount that in no event would the sum stated in the policy exceed three fourths of the value, it would have to be fixed so low in many instances as to seriously hamper the company in the conduct of its business.   Such a plan is not only utterly inconsistent with the whole method and plan by which the company was authorized to do business, but it requires the company to do an impracticable if not an impossible thing, and completely nullifies section 5 of its charter.   Incorporators who were willing to engage in an enterprise where the right guaranteed under section 5 was given might not have been willing to engage in one where it was not.   Neither, in my opinion, does a proper construction of the charter require the company to write what is known as a valued policy.   A valued policy, using this term to designate a policy of fire-insurance in which the value of the property is fixed at the time the policy is written, and under the terms of which the company, in case of loss, would be compelled to settle according to this value, without regard to the actual value at the time of the loss, is a form of policy permitted by the law, but, being one under which a person might recover more than his actual loss, is not favored by the law, and no policy will ever be construed to be a valued one unless it is clear from its terms that it was the intention of the parties that it should have this effect.   See generally, on the subject of valued policies, 1 May, Ins. (4th ed.) § 30; 1 Wood, Fire Ins. (2d ed.) § 41; Richards, Ins. (2d ed.) § 14; 1 Beach, Ins. § 484; Barber, Prin. Ins. § 57; 2 Phillips, Ins. § 1178; 16 Am. & Eng. Enc. L. (2d ed.) 840.   This being true, a charter will not be so construed as to empower the company to issue a valued policy unless the intention to authorize this contract was clearly apparent.   There being such a difference in the risk incurred by an insurance company issuing valued policies from the risk incurred by companies issuing policies where the value is to be determined after the loss occurs, it is clear that a law changing a company of the character last described to a company of the character first described makes a ma-

terial change in the business that is to be carried on and the manner in which the same is to be conducted. A company which under its charter, viewed as a contract, has a right to carry on the latter class of business is protected, under the doctrine of the Dartmouth College case, from a statute which attempts to make it carry on the business of a corporation of the character first referred to.

Under section 5 of the charter the company is guaranteed the right to determine the value after the loss has occurred. Under section 3 the company is authorized to engage in a business by which it will insure against loss by fire, etc., to an amount not exceeding three fourths of the value of the property insured. This section is as much a part of the contract between the State and the incorporators as section 5, and, so far as the controversy involved in the present case is concerned, there was in this section a binding agreement between the State and the incorporators, that the latter were to be allowed to engage in a business in which they were not to be liable for more than three fourths of the value of any property which might be destroyed by fire, and they were not to be required, under any conditions, to pay to one sustaining loss by fire an amount exceeding three fourths of the value of the property insured, and the amount to be so paid was to be in all cases ascertained after the loss had occurred. Under the act of 1895 fire-insurance companies are required to pay, in case of loss, the amount stated in the policy, provided the value of the property at the time of the loss was equal to or greater than that amount, and the value of the property at the time of the loss, if such value is less than the amount stated in the policy, notwithstanding any clause to the contrary in the policy. If the rule laid down in this law is applied to policies issued by the defendant company, the result would be, in many cases, that it would be required to pay more than three fourths of the actual value of the property destroyed. But it is said that this result can be avoided, and the law be allowed to be effective, so far as the defendant company is concerned, if in writing its policies it will state in the face of the same an amount which would in no event exceed three fourths of the value of the property at the time of the loss. The impracticability of such a plan is apparent. It can not be determined in one year what will be the value of the property in another year, even if the company should issue policies renewable annually; and the difficulties would be increased if the

company should issue, as it has a right to do, policies renewable at longer periods of time, not exceeding ten years. The imposition upon the company of such a burden as would have to be carried in order to determine the amount to be fixed in each case, which would inevitably in some cases be less than three fourths of the actual value of the property destroyed at some future time, would, in my opinion, be a violation of the contract contained in its charter. And, in addition to that, the amount stated in the face of the policy would be taken as the true value of the property, which would be, in effect, a valuation of the property before the loss occurred, which would also be a violation of the contract contained in the charter. If the charter of the company is a contract in reference to the matter above referred to, the application of the act of 1895 to it in the management of its affairs would work a material change in regard to the powers, duties, and liabilities of the company, as well as to its very character. For this reason it is not to be presumed that it was the intention of the General Assembly that the law, although broad enough in its terms to apply to mutual insurance companies, was intended to be operative upon this company and others that may be similarly situated. As the General Assembly had no constitutional power to make the act in question applicable to this company, it is not to be presumed that such was their intention, there being nothing in the act expressly indicating such a purpose. On this point see *Habersham etc. Co.* v. *Taylor,* 73 *Ga.* 552.

The foregoing argument has proceeded upon the theory that the act of 1895 would be applicable to this company, if the General Assembly had constitutional authority to make it so. It is not clear, however, that even this is true. The title of the act is to compel insurance companies to pay the full amount of loss sustained up to the amount expressed in the policies, "notwithstanding any stipulation in such *policies* to the contrary." Acts 1895, p. 51. The body of the act contains similar language. So that it is not at all clear that, irrespective of the presumption arising from want of constitutional power, the legislature intended the act to apply to companies whose *charters* contained contrary stipulations. It is conceded in the opinion of the majority that this company has not, by accepting any substantial amendment to its charter, made itself amenable to legislation of this character; and hence a discussion of the acts passed since 1863 relating to this company

is unnecessary here.   I have confined my discussion solely to the constitutional question, and, under the view I have taken of the case, it has not been necessary to either assent to or dissent from other propositions announced in the opinion of the majority.

An examination of the policy involved in the present case will show that the company has not written a contract that is at all in violation of its charter.   On the contrary, the contract as written is in exact accord with the provisions of the charter as to the amount for which insurance can be written by the company and the time that the liability of the company as to amount shall be ascertained.   The company has not undertaken to insure for more than three fourths of the actual value of the property at the time of the loss.   The policy upon its face shows that that was the contract entered into between the parties.   It is true that $4,000 is stated in the policy; but this is not the sum which the company agrees to pay, but is simply stated, according to the usual rule and custom, as a maximum amount beyond which the company will not be liable in any event.   The contract of the company is not to pay this amount, neither is it to pay the full value of the property, if such value should be equal to this amount; but the contract is purely and simply an undertaking on the part of the company to pay a sum which will equal three fourths of the actual value of the property at the time of the loss, provided that sum does not in any event exceed four thousand dollars.   I am of opinion that the act of 1895, if applied to this company, would be an impairment of the obligation of contracts contained in its charter, which is forbidden by the constitution of the United States.