21282. GEORGIA FRUIT GROWERS INC. *v*. VAUGHN.

DECIDED FEBRUARY 23, 1932.

*Jule Felton, Jule W. Felton,* for plaintiff.
*Spalding, MacDougald & Sibley,* for persons at interest.
*D. R. Cumming,* for defendant.

BELL, J.   Georgia Fruit Growers Inc. brought suit against P. W. Vaughn to recover a balance of $2302.30 principal, besides interest, upon several notes executed on different dates from December 8,

1927, to June 15, 1928, aggregating $4,000, and all maturing on August 1, 1928. The notes were payable to Federated Growers Credit Corporation, and were indorsed to the plaintiff *after maturity*. The defendant pleaded, in substance, that the payee of the notes was so interlocked with another corporation, to wit, Federated Fruit & Vegetable Growers Inc., that they amounted to one and the same company, and that he was induced to execute the notes by the fraud of the last-named company, through a common agent who represented it and the payee corporation. Adopting the theory of identity as thus stated by the defendant, we will deal with the case as if the notes had been actually payable to Federated Fruit & Vegetable Growers Inc., and will refer to this company as the payee or the "distributor."

The defendant in his answer admitted that the payee advanced to him the sum of $4,000 as indicated by the notes, but contended that he executed the notes upon the understanding with one G. W. Firror, the agent and representative of the payee, that he would never be called upon to repay any part of the sum so advanced to him except under certain conditions, as follows: The defendant was a peach-grower, having an orchard of about 50 acres in Pike county, Georgia, and the advances were made by the payee to cover the necessary expenses of cultivating, harvesting, and preparing for market his peach crop in the year 1928. The defendant in turn agreed with the payee that he would make it his marketing agent and would pay a stipulated sum for its services in selling his 1928 crop. The defendant also appointed the payee as his agent to procure crop insurance in an amount not less than $4,000, covering all hazards such as frost, freezing, hail, wind, excess moisture, drought, flood, insects, and disease, and fully protecting the defendant up to the amount of the advances represented by the notes. "Defendant was to turn over to said distributor [the payee] his entire crop of car-lot peaches, and the same was to be sold by said distributor and the net proceeds therefrom applied on said advance, and, should said peaches bring net more than said advances, the overplus was to be paid over to defendant, and, if said peaches netted less than said advance, then said distributor was to look solely to said insurance policy for the difference." The insurance policy was to be written by the Hartford Fire Insurance Company, and at the time of the transaction in question a master policy designated as C-1338 was

in existence. The insurance to be obtained for the defendant was to be represented by a certificate to be issued upon the master policy, and to be payable to the distributor as its interest might appear. "Defendant never saw the policy of insurance which distributor procured and was not permitted to see same, but was told and assured that said policy had been taken out and that it was in terms and character such as to fully protect defendant from any liability for the payment of said advance beyond the net value of his peach crop which he was to turn over to said distributor. Defendant relied upon the representations and assurances of said distributor that it would negotiate and procure, and had negotiated and procured, a policy of insurance of the character and in terms that would fully protect defendant from any liability for such advance beyond the net market value of his peaches to be turned over to said distributor. Defendant, in full faith, relied on distributor to discharge this agreement, did turn over to it his entire peach crop for that year, consisting of approximately nine cars, or approximately 2900 bushels. Of this amount the said distributor only permitted defendant to ship one car thereof consisting of 318 bushels, the proceeds of said car amounting to $56.44, which amount was retained by said distributor. The said Firror, as representative of the aforesaid distributor, together with one Fort and one Thompson, as representatives of the Hartford Fire Insurance Company, did then visit the orchard of defendant and condemn same and instruct defendant not to ship any more of said peaches, due to their diseased condition on account of bacteriosis, leaving approximately eight cars of peaches in defendant's said orchard. Said representatives stated that defendant would be protected by the insurance with which said distributor had covered said orchard. Defendant shows further, in the foregoing connection, that during the early part of 1928, his orchard suffered severe damage due to a windstorm, and of which due notice was given, but that he never heard anything further in regard thereto. Defendant says that both the aforesaid windstorm and disease damages were hazards which said distributors agreed to insure against, but for which no accounting was ever had or credits given therefor. The inducement that caused and led this defendant to turn over his crop of peaches to said distributor and to pay it the charges required was the promise and representation of said distributor that it had procured a policy of insurance

that would fully cover any deficit that might arise between the net sale price of the peaches and the amount of said advance. Defendant relied upon the representations of his agent, occupying a fiduciary relation, that such a policy had been procured, and defendant had no available means of knowing that his said agent had not so done."

The defendant further alleged that he paid the sum of $400 to the payee as a premium on the policy, upon the express representation "that a policy of insurance had been taken out of the nature and character as would protect defendant from any liability by reason of said advancement evidenced by said memoranda notes, over and above the net market value of his said peaches which were turned over to said distributor, sold by it, and the proceeds now held by it. Should there be any deficit it was expressly agreed that the same was to be satisfied out of said policy of insurance, to which said distributor agreed to look solely and not to the defendant. Defendant relied upon said representation that such a policy of insurance had been taken out, and on the faith of said representations paid said premium and signed said memoranda notes with the distinct understanding and agreement that defendant's liability was limited to the net value of his said peach crop when and so turned over to said distributor, which was fully and completely done." The defendant carefully pruned, treated, and cultivated his orchard and complied fully with every obligation assumed by him in his dealing and contract with the payee, and fully met all requirements of his agreement relating to the insurance. Since the entire crop, with the exception of one car consisting of 318 bushels, became worthless, and was never harvested or marketed, on account of a diseased condition, the payee should have looked to the insurance company for the remainder of its advances, and if the payee failed to carry out its agreement by obtaining the insurance in accordance with its representations, its failure to do so was "such a fraud on this defendant as vitiates said notes and relieved defendant from any liability thereon."

The plaintiff, Georgia Fruit Growers Inc., demurred to the defendant's answer for insufficiency, and, the demurrer being overruled, the plaintiff brought the case to this court, but the writ of error was dismissed as premature because there had been no final judgment. 41 *Ga. App.* 446. The case thereafter proceeded to

trial and resulted in a directed verdict in favor of the defendant. The plaintiff then filed a motion for a new trial, which was duly amended, and the plaintiff has now excepted to the overruling of this motion.

Substantial copies of several of the written contracts, but not of the master policy or of the certificate issued thereon, were attached to the defendant's answer, but since the case is not here upon demurrer at this time, the contents of the several written agreements will be stated from the evidence, and not the pleadings. The master policy and the certificate were also introduced in evidence, and contained several provisions to be noticed presently. The defendant introduced evidence in support of the allegations as to representations by the agent of the payee, but the agent was also introduced as a witness and contradicted the testimony of the defendant and other witnesses as to the nature and character of the statements and representations alleged to have been made by him.

The evidence did not sustain the allegation in the defendant's answer that he "was not permitted to see" the master policy. Upon this point he testified, "I did not ask Mr. Firror to let me see the policy. . . I made no effort to see the policy, but took Mr. Firror's word for what it covered. The master policy was referred to as "No. C-1338" in one or more of the preliminary agreements between the payee and the defendant, and in the contract in which the defendant appointed the payee as his agent to effect the insurance he expressly stipulated that he agreed "to abide by and accept all conditions of the master policy issued" to the payee.

One of the grounds of the motion for a new trial was that the evidence was in conflict and presented issues of fact which should have been submitted to the jury.

It further appeared from the evidence that the insurance company paid a little over $1,600 to the payee or distributor in settlement of liability under the policy, and this, together with the proceeds of the one car of peaches sold, constituted the only credits upon the several notes sued on. The question was as to the liability of the defendant for the remainder as claimed in the petition. The trial judge, in his order overruling the motion for a new trial, expressed the opinion that, irrespective of all other questions, the master policy made the insurance company liable for the entire amount of $4,000, and that since the payee should have collected

this sum from the insurance company, the defendant was entitled to have credit upon the notes for the remainder of the insurance upon this basis.

The opinion of the trial judge was based upon the following clauses of the master policy:

"5th. It is further specifically agreed that not exceeding 30 per cent. of the maximum insurance permitted per acre as set forth in any certificates issued hereunder, shall be effective prior to April 15, 1928. If the crop is then in good condition and the risk approved in writing by an authorized agent of this company, not exceeding 10 per cent. additional insurance shall become effective from that date until the beginning of harvest. The remaining 60 per cent. insurance permitted per acre hereunder shall automatically attach at the rate of 40 cents per crate or bushel basket for each crate or bushel basket of peaches packed and marketed per acre insured under each certificate issued hereunder.

"8th. In case the total net returns from all peach crops grown by any grower covered by certificates hereunder do not equal or exceed the total amount of insurance applying to such unit as a result of any hazard insured against, then this company shall be liable for not exceeding the amount of the difference between the net returns as defined in paragraph 9 and the amount of insurance applying thereon.

"9th. The actual gross f. o. b. shipping point sale price of the fruit produced shall for the purpose of this insurance be considered as the net returns (but in no event shall the net returns be less than the prevailing f. o. b. shipping point, market price at the time of harvesting for like kind and grade). The gross f. o. b. sale price shall be defined to mean the gross price for which fruit sold f. o. b. shipping point with no selling charge deducted and if sold on consignment the gross f. o. b. sale price shall mean the gross price for which fruit sold at destination point less freight and refrigeration only. In no case shall this company be liable for any loss on freight and/or transportation charges occasioned by failure of crops insured hereunder or any portion or shipment thereof to realize freight and/or transportation charges."

The master policy stated no particular sum as the amount of the insurance, but stipulated that the company "does hereby insure the said assured for account of itself and as agent for such growers as

may be named in the respective certificates issued hereunder, to an amount not exceeding the amount per acre permitted under such respective certificates and not exceeding in the aggregate the total sum of insurance permitted under certificates issued hereunder." The certificate based upon this policy and referring to the crop of the defendant provided that it was issued and accepted "subject to all the terms, conditions, stipulations and endorsements embraced in and annexed to Open Policy No. C 1338 issued to The Federated Fruit & Vegetable Growers of New York, N. Y., in amount of $4,000. From date of the issuance of this certificate to the expiration date named in said Policy No. C 1338. On 50 acres of Elberta peaches, $80 per acre, total amount insured $4,-000.00; rate 10% premium $400."

■ With respect to clause 5 of the master policy, as set forth in the preceding statement, there is no question as to the conditions under which the first 40 per cent. of the insurance would become applicable and effective. The insurance company paid an amount representing 40 per cent. of the maximum insurance of $4,000, as provided in the certificate relating to the defendant's crop. The learned trial judge held, in effect, that the company was also liable for the remaining 60 per cent., and that the payee should have collected this remainder instead of demanding payment from the defendant of the balance due upon the notes in an equal amount. So the question is as to the meaning of the last sentence in clause 5 referring to "the remaining 60 per cent. insurance permitted," when it is construed in connection with the other stipulations and conditions of the policy.

The certificate issued upon the master policy fixed the face of the policy at $4,000 so far as it related to the defendant's crop. Sixty per cent. of this sum would be $2,400, and none of this remainder applied or became effective as insurance until the peaches were "packed and marketed," and then only at the rate of "40 cents per crate or bushel basket." Clause 8, to the effect that the company would be liable for an amount not exceeding the difference between the net returns and the amount of insurance applying upon a particular unit, did not ipso facto render the company liable for the remaining 60 per cent. of the "insurance permitted." The purported liability was for a loss resulting from one of the hazards insured against, not exceeding the amount of the difference between the net

returns and the amount of insurance actually *applying* to such unit, and no part of the 60 per cent. of the maximum insurance permitted ever became applicable or attached to the defendant's crop, except as to such portion as should be "packed and marketed."

The clause as to 60 per cent. merely narrowed the face of the policy to $2,400 "at the beginning of the harvest," and did not constitute an absolute and binding promise to pay this sum irrespective of whether any of the peaches were ever packed or marketed. An agreement in the policy to pay a definite amount regardless of loss or damage would render the policy void as a wagering contract. *Fireman's Fund Ins. Co.* v. *Pekor,* 106 *Ga.* 1 (2), 9 (31 S. E. 779) ; *Ætna Insurance Co.* v. *Brigham,* 120 *Ga.* 925 (3) (48 S. E. 348) ; *Georgia Cooperative Fire Asso.* v. *Lanier,* 1 *Ga. App.* 186 (57 S. E. 910) ; *Norwich Union Fire Ins. Co.* v. *Bainbridge Grocery Co.,* 16 *Ga. App.* 432 (85 S. E. 622). Apparently the stipulation as to liability for 40 cents per crate or basket for each crate or basket packed and marketed was an effort to arrive at the sound value of the peaches as in a "valued policy" (*Rosser* v. *Georgia Home Ins. Co.,* 101 *Ga.* 716 (2), 720, 29 S. E. 286; *Word* v. *Southern Mutual Ins. Co.,* 112 *Ga.* 585 (5), 599, 37 S. E. 897) ; but even as to peaches so packed and marketed, it would still be necessary for the assured to show a loss resulting from a hazard insured against, as well as the amount of such loss, as the measure of his recovery under the policy. In other words, the 40 cents per basket merely fixed the *amount of insurance* to apply on such peaches as were packed and marketed, not to exceed in the aggregate 60 per cent. of the face amount of the certificate, and the company would be liable only for such an amount, whether a part or all of the insurance so provided by the policy, as represented the assured's loss as a result of one of the hazards insured against. It might be said that insurance would be useless as to peaches packed and marketed, but it is conceivable that even in marketing the assured would receive less than 40 cents per crate by reason of some cause or hazard against which he was insured, and in such a case the insurer would be liable for the difference as the loss sustained.

The defendant further contends that the peaches were not packed and marketed because they were rendered worthless by a disease, and were condemned in the orchard by an agent of the insurance company. Whether the insurer might in these circumstances be

estopped from insisting that the peaches were never packed and marketed, the defendant was yet saved the cost of harvesting and processing, and could only recover the difference between this expense and the agreed value of 40 cents per crate. This difference would represent the amount of the assured's loss, and an insurer of property is liable not for the face amount of the policy, but for "the full amount of the loss sustained," not exceeding the face amount. Civil Code (1910), §§ 2544, 2545. If the expense of harvesting and preparing for market would have amounted to as much as 40 cents per crate, then the assured was not damaged, and the company would not be liable for any amount under the "60 per cent. clause," as for peaches that were never packed and marketed, although it may have condemned the peaches in the orchard and thus caused the assured to refrain from packing and marketing them. This feature of the policy may have provided very poor and inadequate insurance, but in our opinion the language used will admit of no other construction except that which we have placed upon it. We think the interpretation adopted by the trial judge would render the policy void as a gaming contract, and such a construction should be avoided if it is reasonably possible to do so. It would be no sufficient reply to say that our own construction would tend equally to render the policy bad as a wagering contract. We need not go so far as to determine the validity of the policy as against such an objection, since the present case does not require a decision of this question. Suffice it to say that if under a proper construction the policy should be held void as a gaming or wagering contract, the payee as the agent of the defendant could not be held answerable as a matter of contract for its failure to collect an amount promised by the insurer in such a policy. It follows from what has been said that we can not sustain the verdict in favor of the defendant upon the theory advanced by the trial court. Moreover, the defendant pleaded no such defense as that adverted to and allowed by the trial judge.

■ The defendant's answer may or may not have been subject to general demurrer. Even the kind of policy referred to in the alleged representations might have been a wagering contract, and, if so, it would seem that the defendant should not have relied upon such representations as to the existence of a policy such as he desired. The answer may have been fatally defective for other rea-

sons. We do not mean to intimate by these observations, however, that the answer did not constitute a good and valid plea. Since the demurrer was overruled without proper objections being taken, and since the answer must therefore be treated as setting forth a valid defense for the purposes of this case, we are simply stating as a matter of precaution that we now decide nothing as to the sufficiency of such an answer under general legal principles. The sufficiency of the particular answer being settled by the law of the case, the defendant would have been entitled to a verdict upon proof of the allegations therein contained, but the evidence did not demand a finding in his favor upon this theory. Questions of fraud are usually to be left to a jury, and especially is this true when there is an issue as to whether the complaining party could have protected himself by the use of the proper diligence.

The defendant *alleged* that he was never permitted to see the master policy. Upon the trial he testified that he had made no effort to see it, relying upon the representations of the person dealt with. Furthermore, the person alleged to have made the representations was introduced as a witness and materially contradicted the evidence for the defendant as to the nature and character of the representations made. See, in this connection, *Fenley* v. *Moody,* 104 *Ga.* 790 (30 S. E. 1002) ; *Benson* v. *May,* 149 *Ga.* 555 (1 *a*) (101 S. E. 177) ; *Rutland* v. *Parham,* 32 *Ga. App.* 662 (124 S. E. 355) ; *Harper* v. *Atlanta & West Point R. Co.,* 33 *Ga. App.* 259 (3), 265 (125 S. E. 885) ; *Briesenick* v. *Dimond,* 33 *Ga. App.* 394 (126 S. E. 306) ; *Sawyer* v. *Birrick,* 33 *Ga. App.* 746 (127 S. E. 806) ; *Coker* v. *Citizens Bank,* 35 *Ga. App.* 595 (4) (134 S. E. 355). The court erred in directing the verdict in favor of the defendant.

*Judgment reversed. Jenkins, P. J., and Stephens, J., concur.*